238 N.J. Super. 8 (1989)
568 A.2d 1196
ROBERT J. SHOLTIS JR., AS EXECUTOR OF THE ESTATE OF ROBERT J. SHOLTIS AND PAULINE SHOLTIS, INDIVIDUALLY AND SAM LEE AND EUNICE LEE, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
AMERICAN CYANAMID CO., ET AL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1989.
Decided December 22, 1989.
*12 Before Judges DREIER, SCALERA and D'ANNUNZIO.
Jane B. Cantor argued the cause for appellants (Garruto, Galex & Cantor, attorneys; Bryan D. Garruto and Jane B. Cantor of counsel; Jane B. Cantor and William E. Paulus, on the brief).
John L. McGoldrick argued the cause for respondents Owens-Illinois, Inc., The Celotex Corporation, Eagle-Picher Industries, Inc., Keene Corporation, The Flintkote Company, Armstrong World Industries, Inc., GAF Corporation, H.W. Porter Company and Porter Hayden Company (McCarter & English, attorneys; Andrew T. Berry, of counsel, Anthony Bartell, on the brief; John L. McGoldrick, on the supplemental letter-brief).
James P. Richardson argued the cause for respondent John Crane Inc. (Sellar, Richardson, Stuart & Chisholm, attorneys; James P. Richardson, of counsel; Wendy H. Smith, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs appeal from summary judgments granted to the remaining defendants in this strict liability asbestos case. Plaintiffs are Robert J. Sholtis, Jr., Executor of the Estate of Robert J. Sholtis and the decedent's widow, Pauline Sholtis, and Sam Lee and Eunice Lee, his wife. Both Mr. Sholtis and Mr. *13 Lee, (plaintiffs) were employees of American Cyanamid Co., a former defendant in this case.[1] The cases were consolidated for discovery purposes by a case management order dated December 2, 1986. Of the many other original defendants, the principal remaining defendants at the time of the summary judgment motions, who had been denominated as the "Wellington defendants," were Owens-Illinois Inc., Celotex Corp., Eagle-Picher Industries Inc., Keene Corporation, The Flintkote Company, Armstrong World Industries Inc., GAF Corporation, H.W. Porter Company and Porter Hayden Company.[2]
This case presents two basic problems. The first is procedural, in that plaintiffs attempted to present supplemental certifications to the court in opposition to defendants' motions after the time had expired for receipt of additional factual material. The trial judge refused to consider this material, and we must determine whether such refusal constituted reversible error.[3] *14 The second issue in the case is whether the trial judge was correct in determining that plaintiffs failed to prove instances of contact between the Wellington defendants' products and either of the plaintiffs. Within this issue we must also consider the legal underpinnings of the factual analysis, namely, whether there is a legal theory that supports potential liability on the part of one or more of the Wellington defendants.
In most asbestos cases, where exposure is cumulative over many years and there is a late manifestation of disease, it is difficult to prove plaintiff's exposure to a particular defendant's product. See Fischer v. Johns-Manville Corp., 103 N.J. 643, 660-661, 512 A.2d 466 (1986). The claimed exposure in both of the cases before us spans over four decades. Plaintiffs worked in and among many of the buildings in the American Cyanamid complex during their long tenures with their employer. Asbestos products were clearly present throughout the American Cyanamid facility, and plaintiffs have attempted to pinpoint where they may have been brought into contact with the products of one or more of the Wellington defendants.
Plaintiff Sholtis died at age 65 from pleural asbestosis before his deposition could be taken. He worked at the American Cyanamid plant from 1941 to 1980, first as a mill operator, then as a maintenance laborer, pipefitter's helper, junior mechanic, and finally as an area mechanic. Given the explanation of Mr. Sholtis' job, there is little doubt that he was directly exposed to *15 and worked directly with asbestos at the plant.[4] His case necessarily relied upon employment records and testimony of co-workers and suppliers to prove when and where he was exposed to asbestos, and which company manufactured the asbestos to which he was exposed. Employees placed him in five different buildings and medical records in an additional five.
While Mr. Sholtis' exposure was both direct and as a bystander, Mr. Lee's exposure was solely as a bystander, since he did not work directly with asbestos. Mr. Lee worked at American Cyanamid from 1952 until 1988. During the first several years he was a laborer, a helper and a janitor, and then in 1964 became a mill operator. From 1983 until retirement in 1988 he again worked as a janitor. At the age of 53 a portion of his right lung was removed due to pulmonary asbestosis. Employment records and his deposition place him in 14 different buildings in the American Cyanamid complex. He testified that since 1983 he has worked "all over the plant" as a janitor. Lee claims that he worked in building 86 at about the same time as another witness was ripping down asbestos at that location. The witness, however, did not specifically recall in what years he worked in building 86, and remembered using only Johns-Manville asbestos.
Witnesses named several manufacturers other than Johns-Manville as suppliers of asbestos to American Cyanamid. Most, however, could not state which product was used in *16 which building, having taken no account of the source of various products at the time. Mr. Lee also testified that he has no knowledge of which manufacturer supplied the asbestos in the plant. The foregoing constitutes a brief summary of the facts originally before the court and upon which the judge's decision was rendered.

I
The new evidence plaintiffs attempted to produce fell into two categories. Some had already been elicited in discovery, but had not been presented to the court as part of plaintiffs' initial papers. Other evidence, such as the Stahoski affidavit, discussed infra, was totally new material. Hovan's second affidavit identified asbestos products manufactured or supplied by five of the Wellington defendants, Porter Hayden, Armstrong, GAF, Owens and Celotex. Hovan stated:
* * * * * * * *
2. While employed at American Cyanamid, I used asbestos containing products manufactured by the following companies:
 Porter Hayden GAF
 Armstrong Celotex
 Johns Manville Raybestos Manhattan
 Owens Corning Fiberglass
These products included, but were not limited to, gaskets, insulation, ceiling and floor tile, pipe covering and brake linings.
3. All members of my trade used the same asbestos containing products as I did during my employment at American Cyanamid and we all got them from the same stockroom. Additionally, vendors often delivered asbestos containing material to us at the spot where we were working on a particular job.
4. While employed at American Cyanamid, we took the asbestos containing products we used into all buildings.
* * * * * * * *
Supplemental affidavits or depositions from Schwartz, Bartushak and Naldi also identified additional manufacturers, including many of the Wellington defendants. Schwartz included *17 Eagle-Picher, Flintkote and Porter Hayden; Bartushak included Porter Hayden; Naldi mentioned Flintkote. An affidavit from a new witness, Stahoski, an insulator, also identified additional defendants' products, including those of Wellington defendants Eagle-Picher, GAF, Owens Corning, and Porter Hayden. At least one of the initial affidavits or certifications supports the presence of the products of each of the Wellington defendants at American Cyanamid during the period both of the plaintiffs worked there. And the new proofs clearly stated that the asbestos products were drawn from a common stockroom and used throughout all the buildings in the American Cyanamid plant.
Defendants assert that all of plaintiffs' amended proofs should have been included in their first certifications opposing the summary judgment motions, and that such supplemental evidence would prejudice defendants in that they would have been forced to conduct further discovery and depose at least the new witness, Stahoski. The trial judge ruled that he would not consider the amended proofs. He stated: "You did not ask me and, therefore, I did not agree to accept either supplemental or additional affidavits from fact witnesses ... it is that [the original] record upon which I must base my decision."
Summary judgment motions are useful in terminating patently meritless litigation. But, as a trial is a search for the truth and courts should dispose of cases on their merits, a judge should approach summary judgment motions with a predisposition to acting only with all reasonably determinable information in hand. A trial judge has discretion to permit supplemental affidavits to be submitted on summary judgment motions. West Point Island Civic Association v. Dover Tp., 93 N.J. Super. 206, 211, 225 A.2d 579 (App.Div. 1966), certif. den. 48 N.J. 576, 227 A.2d 134 (1967). But this discretion should be exercised to increase, not limit, the likelihood that the information before the court reflects the facts that could be adduced at trial. Even as late as at trial, previously undisclosed witnesses *18 may be produced where the failure to supply the witness' "name in answers to interrogatories was not the result of a design to mislead and where there is no surprise or prejudice to the opposing party if the testimony is allowed." Conde v. Browne, 174 N.J. Super. 351, 354, 416 A.2d 915 (Law Div. 1980). See also Brown v. Mortimer, 100 N.J. Super. 395, 401-402, 242 A.2d 36 (App.Div. 1968); Branch v. Emery Transportation Co., 53 N.J. Super. 367, 375-376, 147 A.2d 556 (App.Div. 1958). If such latitude is to be afforded an erring party even at trial, this principle is even more applicable to affidavits submitted in response to a summary judgment motion.
As stated in Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954), on a summary judgment motion, "[a]ll inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated." Id. at 75, 110 A.2d 24. Indeed, under R. 4:46-5(a), a party may aver that "facts essential to justify his opposition" cannot then be presented
in which case the court may deny the motion, may order a continuance to permit additional affidavits to be obtained, depositions to be taken or discovery to be had, or may make such other order as may be appropriate.
In this case plaintiffs did more than aver that they could obtain additional information; they presented the information to the court. Of course, if the additional information made no difference in the ruling, then the admission or exclusion of the material is of no moment. But if the information would have preserved plaintiffs' causes of action, then even in the face of plaintiffs' failure to ask permission from the court to supplement their proofs, strict adherence to the schedules established by the court for discovery and presentation of opposing papers would take too great a toll. For the sake of the court's granting perhaps a two-week continuance so that reply certifications, *19 if any, could be drafted and presented,[5] plaintiffs should not be forced to forfeit their causes of action. If defendants were put to additional expense in attending the initial summary judgment motion, such expenses could have been charged to plaintiffs. In these circumstances, the court should have considered the supplemental documents.

II
Having determined this, we are presented with the same documents, now reviewed by us. They describe the presence of an undefined quantity of the Wellington defendants' products in the American Cyanamid complex during the period of plaintiffs' employment. If we assume that the products were distributed throughout the plant as noted in the Hovan affidavits, we have at least circumstantial evidence of plaintiffs' exposure to undefined quantities of the products of the Wellington defendants. Does this provide a basis for these defendants' liability sufficient to withstand a summary judgment motion?

a. The Trial Judge's Solution

The trial judge granted summary judgment, stating that the proper inquiry was "whether there is sufficient direct or circumstantial evidence from which a jury could infer that each plaintiff was probably exposed to friable asbestos emanating from a defendant's product during the course of his employment history." He also stated that the fact that a plaintiff and a product were in the same building would be insufficient proof to meet this prima facie test, because it is the friability of the product and exposure to the dust when it is released "which is the injury producing event."
There is no question from the testimony that the vast majority of asbestos products in the American Cyanamid plant *20 had been manufactured by Johns-Manville Corp., which was not included in the group of Wellington defendants. While Johns-Manville may now be subject to suit, at the time of the motion, the Johns-Manville bankruptcy had not yet been concluded.[6] The trial judge noted that "it would be speculative for a jury to conclude that the asbestos dust to which both plaintiffs were exposed, other than Johns-Manville products, could be attributable to any one or more remaining defendants."[7] He further accepted the fact that the Wellington defendants' asbestos products were supplied to American Cyanamid, but determined that no witness had provided facts sufficient to establish that either of the plaintiffs had been exposed to the asbestos product of any particular defendant. He also stated that "it would speculative for a jury to conclude that, at the times plaintiff[s] ... [were] exposed to Johns-Manville friable *21 asbestos, that asbestos had been supplied by Porter Hayden as opposed to Charles Wood [the out-of-state distributor] or by Johns-Manville itself." As we indicated in fn. 7, we disagree with this latter conclusion.
These issues are best resolved by reference to the concept of proximate cause. The contact between a plaintiff and the defective product must be sufficiently significant so that a reasonable jury could determine that the product was a substantial factor in bringing about the plaintiff's injury. Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 168, 406 A.2d 140 (1979). Plaintiffs, however, also suggest that some form of collective responsibility can be imposed upon all of the defendants. To determine whether plaintiffs' exposures satisfy the proximate cause requirement, we must briefly discuss different theories of liability for a non-identified tortfeasor.

b. Theories of Liability

We can quickly dispose of three theories. First, we may have an exposure of a plaintiff to the harmful product or conduct of at least one of a known group, in a context where all other named or potential defendants are concededly blameless. In that situation all of the defendants are required to remain in the case and the burden of proof shifts to them to exculpate themselves. Anderson v. Somberg, 134 N.J. Super. 1, 338 A.2d 35 (App.Div. 1973), aff'd 67 N.J. 291, 338 A.2d 1 (1975), cert. den. 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). The Supreme Court has noted that the Anderson rationale "is limited to one factual context." Shackil v. Lederle Laboratories, 116 N.J. 155, 173, 561 A.2d 511 (1989). Second, we may see a single injury discovered after a series of contacts with different potentially responsible defendants, and the plaintiff cannot determine which defendant in the progression of potential culpable defendants caused the injury. In such a case, the plaintiff may join them all, and the burden of coming forward with evidence to exculpate shifts to defendants. NOPCO Chemical *22 Div. v. Blaw-Knox Co., 59 N.J. 274, 281 A.2d 793 (1971). A third situation is presented where two or more defendants have engaged in the same tortious activity at one time, placing plaintiff in the same danger. Although only one has injured the plaintiff, it cannot be determined who actually caused the injury. Again, the burden shifts to defendants to exculpate themselves. (Alternative liability). Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948); Restatement, Torts 2d, § 433B(3) (1965), codifying the Summers v. Tice theory of liability; discussed in Shackil, supra, 116 N.J. at 165, 561 A.2d 511. Without taking the time here to analyze the ramifications of each theory, we find none of these theories applies to this case.
A fourth theory somewhat approaches the problem before us, and has been urged upon us by plaintiffs. Where multiple defendants have all produced the same or similar products, but plaintiff has been exposed to but one or some of them, and through circumstances beyond plaintiff's control, it cannot be determined which manufacturer supplied the product that injured plaintiff, liability may still be found in the appropriate case. As noted by the Supreme Court in Shackil, a market-share modification of the alternative liability theory was adopted in California to provide for this situation. Shackil at 166-168, 561 A.2d 511; see Sindell v. Abbott Laboratories, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924, cert. den. 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). As discussed in Shackil, 116 N.J. at pgs. 167-168, 561 A.2d 511, this theory has been accepted and rejected in various state and federal courts, but as noted infra, New Jersey is not "inhospitable" to such a theory. 116 N.J. at 191, 561 A.2d 511.[8] While the application of a modified market-share theory to vaccines was reversed in *23 Shackil, that general theory of responsibility, recognized by the Appellate Division as viable, was not rejected outright.[9]
As a variant of this theory, a plaintiff may be injured by one product after being exposed over a short period to multiple products each of which was capable of producing the plaintiff's condition, but all of which have varying, but quantifiable, risks. This court has applied the Sindell market-share analysis to such a situation, but we modified the market-share principle by adding the varying risk factor to each defendant's potential liability. Shackil v. Lederle Labs., 219 N.J. Super. 601, 530 A.2d 1287 (App.Div. 1987), rev'd 116 N.J. 155, 561 A.2d 511 (1989). As noted earlier, the Supreme Court in Shackil determined solely that the risk-modified market-share theory cannot be applied to vaccines. ("[O]ur opinion is confined solely to the context of vaccines". 116 N.J. at 191, 561 A.2d 511). The Court, however, there stated its general position, noting that its action in this vaccine case
should not be read as forecasting an inhospitable response to the theory of market-share liability in an appropriate context, perhaps one in which its application would be consistent with public policy and where no other remedy would be available. This case, the Court's first exposure to market-share liability, may therefore come to represent the exception rather than the rule. [Ibid].
We find, however, that all of these theories are inapplicable to the case before us. Plaintiffs here (as in most asbestos cases) present a different situation, which as defendants properly point out is not a true "non-identification" case. Plaintiffs had been subjected to the products of different known manufacturers over a long period of time, in a situation where the exposures first created and then cumulatively exacerbated the problem. In such a case, although the exact sources of the condition or extent of exposure cannot be identified, most courts considering the question have held a market-share theory *24 to be inapplicable.[10] The nature of the asbestos products undoubtedly hampers the use of a market-share approximation of responsibility, especially if a plaintiff were to be required to establish these ratios. See Celotex Corp. v. Copeland, supra, 471 So.2d at 537-538, for a discussion of the varying degrees of toxicity of different asbestos products. The Supreme Court in Shackil took notice of this problem. 116 N.J. at 168, 561 A.2d 511.[11] Furthermore, in a cumulative exposure case such as the one before us, it is both the market-share and the risk factors that would be required to be constantly adjusted over the 30 to 40 year time span of plaintiffs' exposure.
*25 What we have before us are not products of unknown manufacturers whose responsibility must be reconstructed by reference to industry market percentages, but rather known manufacturers' products whose contact with plaintiff must be proven or reasonably approximated by inference. Within the American Cyanamid plant the products emanated from a common storage room and were dispersed to all buildings. This situation bears some resemblance to a plaintiff being injured in a multi-vehicle accident caused by several culpable parties, whose conduct and defective products all contributed to the eventual injuries. In such a context, once it is established that the conduct or defective product of each was a proximate cause, we leave the percentage adjustment of responsibility to a jury. The Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., requires no less.

c. Proximate Cause

Plaintiffs have been exposed to multiple products over a long period of time, but one manufacturer, Johns-Manville, apparently has been responsible for the vast majority of the exposures. In such a case, can the exposure to products constituting but five to ten percent of the friable asbestos at American Cyanamid[12] be considered a proximate cause of Sholtis' death and Lee's injuries? At the outset, we stated that for a defendant to be held liable, the exposure to the products of such defendant, whether proven directly or circumstantially, or if reconstructed or even risk-weighted, must have been a proximate cause of, i.e., a substantial factor in bringing about, plaintiffs' injuries. If the potentially culpable Wellington defendants (apart from Porter Hayden) were each responsible for *26 a fractional share of the remaining five to ten percent, a jury might have a hard time finding that their products were substantial factors contributing to plaintiffs' asbestosis. Additionally, there have been several other settling defendants whose products would be required to be similarly analyzed on a proximate cause basis, thus reducing the Wellington defendants' percentages possibly to fractions of one percent. Young v. Latta, 233 N.J. Super. 520, 523, 559 A.2d 465 (App.Div. 1989).
Yet should the small percentage involved bar a plaintiff's claim as a matter of law? We know that a five percent finding will sustain liability. Stephenson v. R.A. Jones & Co., Inc., 103 N.J. 194, 198-199, 510 A.2d 1161 (1986). A plaintiff has a right to a full, not a ninety to ninety-five percent recovery; and even a ninety to ninety-five percent responsible party has a right of contribution under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq., and the Comparative Negligence Act, N.J.S.A. 2A:15-5.3. The fact that there may be several parties dividing this five to ten percent responsibility should not dilute the rights of a plaintiff or principal defendant.
The most difficult questions in this case involve the proof of individual liability of each of the Wellington defendants, especially since we have determined that no theory of collective responsibility applies. Proof of a plaintiff's exposure to asbestos products has presented a problem to many courts. Various jurisdictions have approached asbestos cases differently, primarily because asbestosis and resulting cancers are recognized as being the products of cumulative exposure. Where no prime defendant has been isolated,[13] and plaintiffs' contact with defendants' products is clear, some courts have held *27 asbestos defendants jointly and severally responsible. For example, in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076 (5th Cir.1973), cert. den. 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), the Court stated:
In the instant case, it is impossible, as a practical matter, to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel. It is undisputed, however, that Borel contracted asbestosis from inhaling asbestos dust and that he was exposed to the products of all the defendants on many occasions. It was also established that the effect of exposure to asbestos dust is cumulative, that is, each exposure may result in an additional and separate injury. We think, therefore, that on the basis of strong circumstantial evidence the jury could find that each defendant was the cause in fact of some injury to Borel. [Id. at 1094].
The Court then concluded "that the defendants may be held jointly and severally liable for the total damages." Id. at 1096.
The reasoning of the Fifth Circuit in Borel was that where there has been "strong circumstantial evidence" of exposure to all of the defendants' products "on many occasions," either the simultaneous or cumulative negligence resulted in joint and several liability, unless the defendants could better apportion their responsibility. See Roehling v. National Gypsum Co., 786 F.2d 1225, 1228 (4th Cir.1986).[14] This principle is not unknown to New Jersey. See Fosgate v. Corona, 66 N.J. 268, 272-273, 330 A.2d 355 (1974). Another part of this court had opined that Fosgate is limited to malpractice cases. Tisdale v. Fields, 183 N.J. Super. 8, 10-11, 443 A.2d 211 (App.Div. 1982). Yet the Supreme Court in Fosgate clearly stated that

*28 in a situation where the malpractice or other tortious act aggravates a preexisting disease or condition, the innocent plaintiff should not be required to establish what expenses, pain, suffering, disability or impairment are attributable solely to the malpractice or tortious act, but that the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are. 66 N.J. at 272-273, 330 A.2d 355. (Emphasis added).
The emphasized portions of the Supreme Court opinion suggest that Fosgate is not limited to medical malpractice cases.[15] The shifting of the burden of proof in Fosgate follows the same logic as that expressed in Anderson v. Somberg, supra, 134 N.J. Super. at 5-6, 338 A.2d 35 (and see 67 N.J. at 298, 338 A.2d 1 for agreement in the plurality opinion on appeal), and NOPCO Chemical Div. v. Blaw-Knox Co., supra, 59 N.J. at 282-283, 281 A.2d 793. Thus in the case of a cumulative injury, and applying the same analysis as under the Texas law discussed in Borel, we see no antipathy in New Jersey to the shifting of the burden of proof.
As a supplement to the Borel approach (as opposed to the even more liberal Starling or Lockwood theories, see fn. 14) is the requirement that a plaintiff prove an exposure of sufficient frequency, with a regularity of contact, and with the product in close proximity; and that such factors should be balanced for a jury to find liability. Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162-1163 (4th Cir.1986) (establishing the "frequency, regularity and proximity" test); see also Blackston v. Shook & Fletcher Insulation Co., 764 F.2d *29 1480, 1482-1483 (11th Cir.1985); Eckenrod v. GAF Corp., 375 Pa.Super. 187, 544 A.2d 50, 52-53 (Pa.Super. 1988), alloc. dn. 553 A.2d 968 (1988); O'Connor v. Raymark Industries, Inc., 401 Mass. 586, 518 N.E.2d 510, 511 (Mass. 1988) (requiring exposure of more than a casual or minimum nature). This "frequency, regularity and proximity" test appears to us to be well-reasoned, properly focusing upon the cumulative effects of the exposure. It is a fair balance between the needs of plaintiffs (recognizing the difficulty of proving contact) and defendants (protecting against liability predicated on guesswork). Industry should not be saddled with such open-ended exposure based upon "a casual or minimum contact." Lohrmann v. Pittsburgh Corning Corp., supra, 782 F.2d at 1162. Yet the phraseology should not supply "catch words;" the underlying concept should not be lost. Since proof of direct contact is almost always lacking, especially in bystander cases, courts must rely upon circumstantial proof of sufficiently intense exposure to warrant liability.[16]
At a summary judgment motion a plaintiff only need produce evidence from which a fact-finder, after assessing the proof of frequency and intensity of plaintiff's contacts with a particular manufacturer's friable asbestos, could reasonably infer toxic exposure. The affidavits, certifications and depositions must be read together anew, giving plaintiffs all favorable inferences. Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 75, 110 A.2d 24. From these sources, the trial judge must determine whether a jury could reasonably infer that one or more of the Wellington defendants must share responsibility.
We recognize an unfairness in our here establishing a standard of exposure, and then, post facto, finding definitively that *30 a particular defendant falls within or outside of the standard. When plaintiffs initially presented their proofs, there were no recognized definitive standards defining exposure. The trial judge correctly noted that at least one part of this court in an unreported opinion had suggested that a single contact could sustain liability. Fairness dictates that we remand this matter to the Law Division, giving both sides a brief opportunity to supplement their proofs directed to the standards we have here established, and thereafter to reargue the merits.
If any or all of the remaining defendants can be found to have supplied substantial shares of the American Cyanamid asbestos, any proof allowing a reduction from joint and several[17] responsibility would come from these defendants' (not plaintiffs') urging that their respective shares should be reduced under the principles of comparative negligence (N.J.S.A. 2A:15-5.1 et seq.). Comparative negligence in a strict liability context is equated with comparative fault, measuring the proximate cause elements of each factor. Suter v. San Angelo Foundry & Machine Co., supra, 81 N.J. at 162-163, 406 A.2d 140. Defendants would merely be joint tortfeasors, seeking as a matter of traditional "risk modification" (not to be confused with market-share risk-modification) to reduce their culpability based upon proof of an allegedly safer product or a smaller share of plaintiffs' total exposure.
In summary, to prevail against a particular defendant in an asbestos case, a plaintiff must establish, in addition to other elements of a product liability action, exposure to friable asbestos manufactured or distributed by the defendant. What has principally concerned us here is proof that each plaintiff's exposure to each defendant's asbestos was a proximate cause of plaintiff's disease, i.e., that the exposure was a substantial *31 factor in causing or exacerbating the disease. When a defendant moves for summary judgment, the motion judge must determine whether the evidence would support an inference that the foregoing elements exist. In the present case, the narrow issue, as we view the record, is whether the evidence is sufficient to create a jury question regarding the proximate cause element as to each of the Wellington defendants. If the evidence establishes that reasonable jurors could infer that sometime during their work histories at American Cyanamid, plaintiffs were exposed to a defendant's friable asbestos frequently and on a regular basis, while they were in close proximity to it (balancing these factors); and if competent evidence, usually supplied by expert proof, establishes a nexus between the exposure and plaintiff's condition, then that defendant's summary judgment motion must be denied.
Specifically, we find that the exclusion of the additional evidence of asbestos exposure was error. The claims against Porter Hayden are reinstated; the claims against the remaining Wellington defendants are remanded to the Law Division for a redetermination of these defendants' potential responsibility after receipt of any supplemental proof and application of the standards contained in this opinion.
NOTES
[1] Once discovery was completed, American Cyanamid Co. was dismissed as a defendant.
[2] Defendant, John Crane Inc. (formerly John Crane-Houdaille Inc.), is separately represented in this matter. The dismissal of this defendant, however, stood on a different basis, namely, that there had been no evidence that Crane's products were friable, i.e., that they released asbestos fibers into the air. Crane's expert witness stated in his report that there was no release of asbestos fibers from any Crane product, and this conclusion remained unrefuted at the summary judgment motion. Other than two brief mentions in the record concerning the fact that Crane's products may have been at the American Cyanamid plant, there is no basis upon which to hold Crane responsible for the asbestos related death and sickness of the two plaintiffs. We note that plaintiffs' brief contains no arguments to support their appeal against Crane, plaintiffs having directed all of their arguments against the Wellington defendants. We therefore affirm the summary judgment granted in favor of Crane.
[3] Of course, in order for us to evaluate whether the exclusion of this material was erroneous, we must examine the proffer, notwithstanding the fact that it technically was not part of the record upon which the judge's decision had been made. At first, the Wellington defendants refused to answer any arguments raised by plaintiffs based upon this additional material. In their initial appellate brief, they merely reserved their rights to submit a supplemental brief if we decided to consider the additional information. After our initial review of the briefs, we directed defendants to file supplemental briefs specifically answering the points raised by plaintiffs. For future guidance, we note that a respondent may not sua sponte choose which points it will answer and which points it will reserve for a supplemental brief after the court has indicated a preliminary determination. If material is to be stricken from a plaintiff's brief or appendix, a suitable motion should be made; but absent such motion, a respondent is required to file a fully responsive brief. R. 2:6-4(a).
[4] One co-worker, Michael Hovan, also a 40-year employee of American Cyanamid, stated in his initial affidavit that Sholtis "was exposed to asbestos products in packing and insulation" and identified Armstrong, Celotex, Flintkote and Porter Hayden as Wellington defendants who either manufactured or supplied asbestos to American Cyanamid. One might even read the affidavit to state that "these" products were the ones to which Sholtis was exposed. There is no mention, however, of any frequency or of regular exposure. Other witnesses were more specific. They saw Mr. Sholtis "ripping off asbestos containing materials from pipes, pumps and furnaces," and noted that an area mechanic would rip insulation from pipes about once a week, sometimes 150 feet at a time, and also was exposed to asbestos in the form of asbestos rope.
[5] Although defendants claim that they would have had to depose the new fact witness, he added little to implicate the Wellington defendants. If a deposition were required, we presume that it could have been taken on short notice.
[6] The Johns-Manville reorganization plan had been approved by the Bankruptcy Court in 1986. Matter of Johns-Manville Corp., 68 B.R. 618 (Bankr.Ct.S.D.N.Y. 1986), aff'd o.b., 78 B.R. 407 (S.D.N.Y. 1987), aff'd 843 F.2d 636 (2nd Cir.1988). We have been informed that all legal challenges to the plan have now been exhausted, and that claims are being processed and resolved.
[7] Johns-Manville products have been estimated as constituting 90-95% of the asbestos in the American Cyanamid plant during the relevant periods. Furthermore, one of the Wellington defendants, Porter Hayden Company, was described as the principal distributor of Johns-Manville products. Although it is clear that American Cyanamid may have purchased a small percentage of the Johns-Manville products, either directly from the manufacturer or, for a five-year period, through Charles Wood, an out-of-state distributor, Porter Hayden's status as the exclusive New Jersey distributor for Johns-Manville products places it in a class separate from the other Wellington defendants. Notwithstanding the potential conflict of interest between Porter Hayden and its codefendants, defense counsel assured us that waivers of such conflict had in fact been secured and the parties wish to present their arguments on a consolidated basis. Insofar as we refer to the Wellington defendants as non-Johns-Manville defendants, it should be understood that we do not mean to include Porter Hayden, in that it may be responsible as a distributor even though it may also be entitled to indemnification from the manufacturer. Promaulayko v. Johns-Manville Sales Corp., 116 N.J. 505, 571, 562 A.2d 202 (1989); Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 566, 410 A.2d 674 (1980).
[8] This statement would appear to qualify the contrary determination of this court in Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 427 A.2d 1121 (App.Div. 1981), that no theory of non-identification liability is acceptable in New Jersey.
[9] The court "reserve[d] decision on the general appropriateness of including products with different degrees of risk in a market-share analysis." 116 N.J. at 176, 561 A.2d 511.
[10] Nearly every court to consider the application of market-share liability against asbestos manufacturers has rejected the theory. Menne v. Celotex Corp., 861 F.2d 1453, 1468 n. 24 (10th Cir.1988); Blackston v. Shook & Fletcher Ins. Co., 764 F.2d 1480 (11th Cir.1985); Thompson v. Johns-Manville Sales Corp., 714 F.2d 581 (5th Cir.1983); cert. den. 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); Marshall v. Celotex Corp., 651 F. Supp. 389 (E.D.Mich. 1987); Vigiolto v. Johns-Manville Corp., 643 F. Supp. 1454 (W.D.Pa. 1986), aff'd 826 F.2d 1058 (3rd Cir.1987); Hannon v. Waterman Steamship Corp., 567 F. Supp. 90 (E.D.La. 1983); In re Related Asbestos Cases, 543 F. Supp. 1152 (N.D.Cal. 1982); Starling v. Seaboard Coast Line R. Co., 533 F. Supp. 183 (S.D. Ga. 1982); Mullen v. Armstrong World Industries, Inc., 200 Cal. App.3d 250, 246 Cal. Rptr. 32 (Cal. App. 1988); Celotex Corp. v. Copeland, 471 So.2d 533 (Fla. 1985); In re Asbestos Litigation, 509 A.2d 1116 (Del.Sup.Ct. 1986), aff'd sub. nom. Nicolet, Inc. v. Nutt, 525 A.2d 146 (Del. 1987); Goldman v. Johns-Manville Sales Corp., 33 Ohio St.3d 40, 514 N.E.2d 691 (1987); Case v. Fibreboard Corp., 743 P.2d 1062 (Okla. 1987). The two reasons most often cited for refusing to recognize market-share liability are the nonfungibility of asbestos and the difficulty of identifying the relevant market. Only in Lockwood v. AC & S, Inc., 44 Wash. App. 330, 353-356, 722 P.2d 826, 840-841 (Wash. App. 1986), aff'd 109 Wash.2d 235, 744 P.2d 605 (Wash. 1987), was there an intimation that a market-share theory might be applicable. The Lockwood court alluded to Washington's adoption of a market-share liability principle in Martin v. Abbott Labs., 102 Wash.2d 581, 689 P.2d 368 (Wash. 1984), and further noted that a variation on the market-share approach "may well be advisable in the proper case." 722 P.2d at 842, n. 20.
[11] The Shackil Court expressed no direct prohibition against applying market-share liability against asbestos manufacturers, but observed that, in the context of asbestos litigation, most courts have rejected the theory "for public policy reasons." 116 N.J. at 168, 561 A.2d 511.
[12] Porter Hayden cannot be included in the group of defendants which is responsible for only this small percentage. The fact that Porter Hayden was not Johns-Manville's exclusive distributor, in that a small percentage of the products during a five-year period may have been distributed by Charles Wood and an additional small percentage may have been purchased directly from Johns-Manville, should not appreciably dilute Porter Hayden's responsibility for the Manville asbestos. See note 7, supra.
[13] We see no reason to apply a different rule when a prime defendant has been identified, since, as noted earlier, that defendant and any plaintiff have a right to recover any reasonably significant share from any other defendant proven responsible.
[14] Even more liberal implied contact rules, requiring but scant proof, have been expressed in Starling v. Seaboard Coast Line R. Co., supra, 533 F. Supp. at 191, and Lockwood v. AC & S Inc., supra, 44 Wash. App. at 353-356, 722 P.2d at 840-841. Starling extended Borel in that a prima facie case was deemed established "if the plaintiff can prove that he was exposed to the defendant's products on at least one occasion," and the evidence of such exposure could be circumstantial. Lockwood, also relied upon a lesser standard to prove contact, agreeing that under Washington law the circumstantial proof was sufficient, and holding that a prima facie case had been established against the defendants "once their products had been located in the shipyards where Lockwood worked during the period that Lockwood was there." 722 P.2d at 841.
[15] See also Hoppe v. Ranzini, 158 N.J. Super. 158, 171, 385 A.2d 913 (App.Div. 1978), applying the same principle to defendants in an attorney malpractice case, and Paolicelli v. Wojciechowski, 132 N.J. Super. 274, 278-279, 333 A.2d 532 (App.Div. 1975), certif. den. 68 N.J. 153, 343 A.2d 441 (1975), reasoning by analogy from Fosgate with respect to liability for the flooding of land. The Supreme Court in Ostrowski v. Azzara, 111 N.J. 429, 444, 545 A.2d 148 (1988), noted that in the professional context the defendants should bear the burden of demonstrating proper segregation of damages from aggravation, the same policy should apply to mitigation of damages. Tisdale was cited as opposed to this proposition.
[16] Expert proof would usually be required to establish, even inferentially, that the exposures caused or exacerbated plaintiffs' eventual injuries. This proof would be in addition to the expert proof of the asbestos-related injury itself.
[17] Such an analysis must be distinguished from that of Shackil, where we noted that where a market-share theory has been applied, the judgments entered are several, rather than joint and several. 219 N.J. Super. at 632-633, 530 A.2d 1287.