**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3642-14T1

WILLIAM P. CONDON and DEBBIE
CONDON, individually and as
Executrix and Executrix ad
Prosequendum for the Estate of
WILLIAM P. CONDON,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

ADVANCE THERMAL HYDRONICS,
INC., f/k/a The Hydrotherm
Corporation; AFTON PUMPS, INC.;
A.I.I. ACQUISITION, LLC, as
successor-in-interest to
Holland Furnace Company;
AMERICAN REFRACTORIES CO.;
A.O. SMITH WATER PRODUCTS
COMPANY; AMERICAN PREMIER
UNDERWRITERS, INC., f/k/a Penn
Central Corp., f/k/a GK
Technologies, Inc., f/k/a
General Cable Corp., individually
and as successor to Hydrotherm,
Inc.; ARCY MANUFACTURING INC.;
ASHLAND, INC.; ATLAS TURNER;
AURORA PUMP; AUTOMATION
INDUSTRIES, INC., individually
and as successor to Hydrotherm,
Inc.; BECHTEL CORPORATION;
BELMONT PACKING & RUBBER COMPANY;
BORG WARNER MORSE TEC, as
successor by merger to the

Borg Warner Corporation; BRADFORD-WHITE WATER HEATERS, INC.; BRYAN STEAM, LLC a/k/a Bryan Boilers; AIR & LIQUID SYSTEMS CORPORATION, as successor by merger to Buffalo Pumps, Inc.; BURNHAM LLC, individually and as successor to Burnham Corporation, individually and as successor-in-interest to Federal Boiler and Radiator Co.; BRYON JACKSON PUMPS AND UNITED PUMPS & COMPRESSOR; CALON INSULATION CORPORATION; CARDONE INDUSTRIES, INC., individually and as successor to Cardo Automotive Products Company; CARRIER CORPORATION; CBS CORPORATION, a Delaware Corporation, f/k/a Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania Corporation, f/k/a Westinghouse Electric Corporation; CERTAINTEED CORPORATION, individually and as successor to Keasbey & Mattison Co.; CLEAVER BROOKS COMPANY, a division of AQUA-CHEM, INC.; COLUMBIA BOILERS COMPANY OF POTTSTOWN; CRANE CO., INC., and as successor to Jenkins Valves, Inc., a/k/a Jenkins Bros.; CRANE PACKING COMPANY; CRANE PUMPS AND SYSTEMS, INC.; DANA COMPANIES, LLC f/k/a Dana Corporation, individually and as successor-in-interest to Victor and Spicer; DAP PRODUCTS, INC., individually and for its Tharco Product; DB RILEY, INC., individually and as successor to and/or f/k/a DB Riley Stoker Corporation and as successor to, and/if f/d/b/a Union Iron Works; DEMING PUMPS, a division of Crane

2

Pumps Systems, Inc.; DUCTMATE INDUSTRIES, INC.; DUNPHEY SMITH COMPANY; EATON CORPORATION, as successor-in-interest to Eaton Electrical, Inc., and Cutler-Hammer, Inc.; ECR INTERNATIONAL, INC., f/k/a Dunkirk and Utica Boilers; FLEXIBLE TECHNOLOGIES, INC., individually and as successor to Hydrotherm, Inc.; FLOWSERVE CORPORATION; FMC CORPORATION, on behalf of its former Peerless Pump and Northern Pump Business; FORD MOTOR COMPANY; FORT KENT HOLDINGS, INC., f/k/a Dunham Busch, Inc., as successor-in-interest to Iron Fireman Combustion Products; FOSTER WHEELER ENERGY CORP.; GENERAL ELECTRIC COMPANY; GEORGIA PACIFIC LLC; GOULDS PUMPS INCORPORATED; HERCULES, INC.; HOLLINGSWORTH & VOSE COMPANY; HONEYWELL INTERNATIONAL, INC., f/k/a Allied Signal, Inc. as successor-in-interest to The Bendix Corporation; HYDROTHERM, INC.; HB SMITH, INC.; IMO INDUSTRIES, INC., as successor to and f/k/a Delaval Turbine, Transamerica Delaval and IMO Delaval; INGERSOLL-RAND COMPANY; J.H. FRANCE REFRACTORIES COMPANY; JOHN CRANE, INC.; JOHNSTON BOILER CO.; KAISER GYPSUM; LAWRENCE PUMPS, INC., as successor-in-interest to Ducan Heating Corp.; MAGNATROL VALVE CORP.; MCNALLY INDUSTRIES, INC.; MAREMONT CORPORATION; MESTEK, INC., individually and as successor to Hydrotherm, Inc.; OAKFABCO, INC., f/k/a

A-3642-14T1

Kewanne Boiler Corp.; PACIFIC STEEL BOILERS, a division of Crane Company; PCC TECHNICAL INDUSTRIES, INC., f/k/a Boiler Technologies, Inc., individually and as successor to Hydrotherm, Inc.; PEERLESS INDUSTRIES, INC.; PRESTOLITE PERFORMANCE, individually and for its Hays Brand; SOS PRODUCTS CO.; RAYPAK INC.; REED NATIONAL FINANCIAL CORP., individually and as successor to Hydrotherm, Inc.; ROPER PUMP CO.; SB DECKING, INC., f/k/a Selby Battersby & Company, a subsidiary of Quaker Chemical Corporation; SUPERIOR BOILER WORKS; STERLING FLUID SYSTEMS (USA) INC., f/k/a LaBour Pump Co.; TACO PUMPS; THE FULTON COMPANIES, individually and as successor to Fulton Boiler Works, Inc.; THE OKONITE COMPANY; THERMCO; TRANE US, INC., as successor to American Standard Inc.; TUTHILL CORPORATION; UNION CARBIDE CORP.; UNION PUMP COMPANY; UNITED SUPPLY CORPORATION; UTICA BOILERS; VIKING PUMP CO.; WALLWORK BROTHERS, INC.; WARREN PUMPS, INC., individually and as successor to The Quimby Pump Company; WEIL-MCLAIN COMPANY, INC.; WEINMAN PUMPS; WOOLSULATE CORPORATION; WORTHINGTON PUMP CORPORATION; ZURN INDUSTRIES; JOHNSON CONTROLS, INC., individually and as successor-in-interest to York International Corp.; SEQUOIA VENTURES, INC., f/k/a Bechtel Corporation; BW/IP, INC., and its wholly owned subsidiaries; FREEMAN AUTO PARTS; and USCO, INC.,

A-3642-14T1

Defendants,

and

PECORA CORPORATION,

     Defendant-Appellant/
     Cross-Respondent.

---

Argued February 14, 2018 — Decided July 9, 2018

Before Judges Alvarez, Nugent, and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5695-13.

Patricia M. Henrich argued the cause for appellant/cross-respondent (Reilly, Janiczek, McDevitt, Henrich & Cholden, PC, attorneys; Patricia M. Henrich and Josette F. Spivak, on the briefs).

Amber R. Long argued the cause for respondent/cross-appellant (Szaferman, Lakind, Blumstein & Blader, PC, and Levy Konigsberg, LLP, attorneys; Robert E. Lytle and E. Elizabeth Sweetser, on the briefs).

Phil S. Goldberg and Mark A. Behrens (Shook, Hardy & Bacon, LLP) of the District of Columbia Bar, admitted pro hac vice, attorneys for amici curiae Coalition for Litigation Justice, Inc., National Association of Manufacturers, American Tort Reform Association, and NFIB Small Business Legal Center (Philip S. Goldberg and Mark A. Behrens, on the brief).

McCarter & English, LLP, and Gibbons, PC, attorneys for amicus curiae Honeywell International, Inc. (John C. Garde, of counsel and on the joint briefs; Kim M. Catullo and Ethan D. Stein, of counsel; Christopher A.

Rojao and Elizabeth K. Monahan, on the joint briefs).

Caruso Smith Picini, PC, attorneys for amici curiae Union Carbide Corporation and CertainTeed Corporation (Richard D. Picini and Anthony Caruso, on the joint briefs).

Eckert Seamans Cherin & Mellot, LLC, attorneys for amici curiae A.O. Smith and Superior Lidgerwood Mundy (David M. Katzenstein, on the joint briefs).

Marshall Dennehey Warner Coleman & Goggin, attorneys for amici curiae Kaiser Gypsum Company, Riley Power, Jaeger Lumber and Supply Company, and Warren Pumps (Paul C. Johnson, on the joint briefs).

Pascarella DiVita, PLLC, attorneys for amici curiae Ingersoll Rand Company, Trane US, Inc., General Cable Corporation, and Rheem Manufacturing Company (Lisa M. Pascarella and Stephanie A. DiVita, on the joint briefs).

Reilly, Janiczek, McDevitt, Henrich & Cholden, PC, attorneys for amici curiae Aurora Pump Company and Cleaver Brooks (Patricia M. Henrich and Brandy L. Harris, on the joint briefs).

Sedgwick LLP, attorneys for amici curiae BorgWarner Morse TEC LLC, Foster Wheeler LLC, survivor to a merger with Foster Wheeler Corporation, and Foster Wheeler Energy Corporation (Christopher J. Keale, on the joint briefs).

Diane M. Pompei (Lynch Daskal Emery LLP), attorney for amicus curiae Georgia-Pacific LLP.

McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for amici curiae Burnham LLC and

Eaton Corporation (Nancy McDonald, on the joint briefs).

McGivney & Kluger, attorneys for amici curiae Ductmate Industries, The Fairbanks Company, Herman Sommer, and Magid Glove and Safety (Thomas McNulty, on the joint briefs).

PER CURIAM

On June 19, 2014, a Law Division judge denied defendant Pecora Corporation's motion for summary judgment. The matter proceeded to trial on plaintiff William Condon's (Condon) complaint for damages related to his mesothelioma, and his wife Debbie Condon's per quod claim (collectively, plaintiffs). The jury, after apportioning damages of two percent to Pecora, awarded plaintiffs compensatory damages of $6.5 million. On plaintiffs' punitive damage claim, the jury awarded Condon $1 million. The trial court molded that verdict to $650,000, in accordance with the punitive damages cap under the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17.[1] Accordingly, plaintiffs recovered $783,067.83 from Pecora. We now vacate the judgment and reverse the trial court's denial of the motion for summary judgment.

---

[1] N.J.S.A. 2A:15-5.14(b) holds that "No defendant shall be liable for punitive damages in any action in an amount in excess of five times the liability of that defendant for compensatory damages." Pecora owed two percent of the $6.5 million award for compensatory damages, which equals $130,000. Five times $130,000 equals the $650,000 that was reached.

A-3642-14T1

Plaintiffs' complaint originally named ninety-seven defendants. Of the defendants who settled with Condon, nine did so before trial. The jury apportioned liability and damages between eleven defendants, including Pecora. Other than the six who were defendants at trial, the court granted the remainder summary judgment and dismissed them from the case, or plaintiffs abandoned the claims against them, or they were otherwise dismissed from the litigation.

Pecora unsuccessfully moved for judgment notwithstanding the verdict (JNOV) or a new trial on March 6, 2015. The judge denied the motion. That decision, like the summary judgment decision before it, was based on the judge's finding that Pecora was the "exclusive supplier" of asbestos cement used in the Burnham products to which Condon was exposed. We conclude that factual finding was not supported by the record.

I.

On appeal, plaintiffs concede "[t]here is no substantial difference between the evidential materials Plaintiff[s] relied upon in opposing Pecora's motions for summary judgment and for judgment notwithstanding the verdict." Although we have the record of the several weeks' long trial, we are nonetheless confined to the summary judgment record. See Ji v. Palmer, 333 N.J. Super. 451, 459 (App. Div. 2000).

A-3642-14T1

We recount the relevant facts drawn from the summary judgment materials. These materials included Condon's deposition and the deposition of a retired Burnham employee, Fred W. Kendall, taken in unrelated asbestos litigation on August 8, 1991.

From 1972 to 1987, Condon worked for Fritze Heating and Cooling (Fritze), which he described as a big company that "did commercial and residential heating and air conditioning installations." His work "mainly" included residential installations. Condon did both residential and commercial jobs but "was not involved with the commercial that much." He installed systems in new homes and replaced them in existing homes. Condon did not repair boilers because Fritze had "a specific service department." He recalled repairing only one Burnham boiler that he repaired because it leaked at installation.

Most of the boilers Condon installed were packaged boilers. He very rarely installed boilers requiring on-site assembly.

Condon estimated about sixty percent of the boiler installations he performed were in houses that did not already have an existing unit. The other jobs required him to remove an existing boiler, where "a lot of the times [he] had to break it apart."

Condon identified Weil-McLain, Peerless, Burnham, Utica, Florence, A.O. Smith, and Hydrotherm as the brands of boilers that

he installed at Fritze during a six-month period. The only Burnham boilers Condon recalled installing were residential packaged boilers. During his years with Fritze, Condon installed hundreds of boilers.

The "packaged boilers" were delivered with asbestos rope, gaskets, and cement, or "trim kits." When Condon needed asbestos cement or gaskets that were not packaged with the boilers, he obtained them from a supplier close to Fritze. He did not remember the brand he used.

Condon could not recall whether Burnham's residential packaged boilers came with trim kits. When deposed, Kendall answered "Not that I'm aware of" to the question of whether "asbestos[-]containing gaskets, rope packing, or cement" were "supplied with Burnham's residential packaged boilers." The possible exception was a pre-cut gasket.

Most of the time, the asbestos cement Condon used came in a powder that had to be mixed with water. Condon would apply it with his hands and then, after it dried, scrape it off, creating "some dust" that he breathed.

Condon testified he would use premixed, wet cement rather than dry cement when he worked on furnaces rather than boilers. He also applied the premixed cement with his hands, and it too would dry and create dust when removed. The premixed cement he

used was supplied by Fritze, but the only manufacturer he recalled for the product was DAP. The asbestos-containing products used by Condon included a warning to keep away from children.

Between 1985 and 1987, Condon was promoted to an installation foreman. In that job, he ceased doing any installations and stopped using asbestos-containing products.

Condon left Fritze in 1987 and began his own business, William's Heating and Air Conditioning. When he operated the business, he was not exposed to any asbestos-containing products.

Pecora manufactured a premixed, heavy paste, which contained 1.25 percent asbestos. Pecora did not manufacture a dry cement product. Condon did not specifically recall ever using premixed cement manufactured by Pecora.

Plaintiffs concede the sole evidential link between Pecora and Condon was through Burnham. Specifically, plaintiffs point to Kendall's deposition. From 1967 to 1974, Kendall was a buyer, and from 1974 to retirement, a senior buyer. He was familiar with the types of asbestos-containing products that Burnham purchased during the years he was employed there.

According to Kendall, Burnham had a residential steel boiler plant, a commercial steel boiler plant, and a cast iron boiler plant. Burnham purchased premixed, high-temperature, asbestos-containing cement for use with those products.

Kendall believed Burnham was using Pecora cement in the cast iron plant since at least 1967 until sometime in the early 1980s. He testified:

> Q. Of the cast iron furnaces, do you know which models of furnaces the Pecora furnace cement was used for or on?
>
> A. We manufactured -- excuse me. Boilers, not furnaces.
>
> Q. I'm sorry. Boilers.
>
> A. There is a difference.
>
> Q. Okay.
>
> A. No, I do not know.
>
> Q. Would you know whether or not the furnace cement was used on knockdown boilers, as opposed to package boilers?
>
> . . . .
>
> A. No, I don't know.
>
> Q. Do you know if they were used on residential boilers as opposed to commercial, or industrial boilers?
>
> A. Basically residential.

At his deposition, Kendall was shown documents he identified as an order and confirmation for sixty gallons of Pecora asbestos furnace cement, purchased in gallon cans, that was shipped to the Burnham cast iron plant in 1978. Kendall also identified a "travelling requisition form" indicating Burnham purchased twelve

A-3642-14T1

cartons containing twelve two-pound cans of Pecora premixed cement to be used for "PF-5 SPECIAL Repairs." Kendall testified:

> A. PF-5 is a model. It should be a special model PF-5 and two pound cans would be the size of cans that would be shipped out for repairs or assembly out in the field, as opposed to the 15 pound cans that they use in the plant.
>
> Q. Okay. So, the larger cans were used for application to boilers.
>
> A. Production line.
>
> Q. And the smaller cans, as evidenced by this traveling requisition, were used in the field?
>
> A. Correct.

Kendall could not recall Burnham ever purchasing this type of "high temperature cement" from anyone other than Pecora, and he believed it was "highly unlikely" that it did.

Relying on this testimony, plaintiffs' counsel asserted, and the trial court accepted, that Pecora was the "exclusive supplier of asbestos cement to Burnham." More specifically, that Pecora was the exclusive supplier of premixed, wet asbestos cement to Burnham.

The evidence also showed Burnham purchased quantities of dry asbestos cement, which was not manufactured by Pecora. Kendall testified:

> Q. One of the products, I guess the principal product that I'm going to be

13

interested in, there may be other people in the room that will ask you about some of these other products, is something called 7M Cement. Do you know whether Burnham ever purchased any 7M cement?

A. Yes.

Q. And it's your testimony that Burnham did purchase 7M asbestos cement while you were employed there?

A. My recollection is that's the asbestos shorts, that's the dry cement. 7M is a particular manufacturer's terminology for it.

Burnham stopped purchasing dry asbestos cement in the late 1970s or early 1980s.

At deposition, Kendall was asked whether he could recall ever using premixed cement as opposed to dry cement when installing Burnham boilers. He responded:

Q. Are you familiar with any sealant paste shipped in covered metal pails --

A. No, because the term "sealant paste" is a little general. No, it's not specific enough so I cannot. I cannot identify that, no.

Q. Just so I'm clear, Mr. Kendall, summarizing your testimony, is it fair to say that other than the purchases of Pecora furnace cement that we've discussed today, you don't have any personal knowledge of any earlier or later purchases of Pecora furnace cements by Burnham?

. . . .

A. No.

. . . .

Q.   Actual purchase that you can recall.

A.   No, no.

Q.   Your recollection is drawn from the documents and, beyond that, you don't have any other specific recollection?

A.   That's correct.

Pecora raises the following points on appeal:

I.   THE TRIAL COURT ERRED IN DENYING PECORA'S MOTION FOR SUMMARY JUDGMENT

> A.   Plaintiff Has Not Provided Proof Sufficient To Allow A Reasonable Factfinder To Determine That Any Burnham Boiler Plaintiff Installed Came With A Can Of Pecora Cement
>
> B.   Plaintiff Has Not Provided Proof Sufficient To Allow A Reasonable Factfinder To Determine That His Work With Burnham Boilers Would Have Exposed Him To Pecora Cement Which Was Contained Within The Boiler
>
> C.   Pecora Is Not The Exclusive Supplier Of Asbestos Cement To Burnham

II.   THE TRIAL COURT ERRED IN DENYING PECORA'S MOTION TO DISMISS THE PUNITIVE DAMAGES CLAIM

> A.   The Evidence Submitted Regarding Pecora's Knowledge Is Insufficient To Meet The Clear And Convincing Standard
>
> B.   The Trial Court Abused Its Discretion In Admitting The Union Carbide Testimony As It Was Not Relevant And Its Value Was Outweighed By The Danger Of Unfair Prejudice

15

C. The Trial Court Abused Its Discretion In Admitting Evidence Concerning Protections Provided To Pecora's Employees

D. The Trial Court Abused Its Discretion In Admitting Evidence Concerning Pecora's Decision To Stop Using Asbestos

E. The Trial Court Abused Its Discretion In Admitting The Opinion In The Matter Of <u>Tysenn v. Johns-Manville Corp[.]</u>

F. The Trial Court Abused Its Discretion In Admitting Evidence About Other Pecora Products

G. The Jury Charge And Verdict Sheet Do Not Set Forth The Applicable Standard

Plaintiffs' points on cross-appeal are:

POINT III
THE TRIAL COURT ERRED IN ALLOWING THE NON-SETTLING DEFENDANTS TO INTRODUCE INTO EVIDENCE ANSWERS TO INTERROGATORIES AND DEPOSITION TESTIMONY THE SETTLING DEFENDANTS PROVIDED IN OTHER LITIGATION BECAUSE, AS THIS COURT HELD IN <u>BUTTITTA</u>, SUCH EVIDENCE IS HEARSAY THAT DOES NOT FALL WITHIN ANY EXCEPTION TO THE RULE AGAINST HEARSAY

POINT IV
THE TRIAL COURT ERRED IN INSTRUCTING THE JURY, CONTRARY TO THE SUPREME COURT'S OPINION IN <u>SHANKMAN V. STATE</u>, 184 N.J. 187 (2005), THAT PLAINTIFF HAD "SETTLED" HIS CLAIMS WITH OTHER PARTIES AGAINST WHICH THE REMAINING DEFENDANTS ASSERTED CROSS-CLAIMS, THUS IMPLYING THAT THOSE PARTIES HAD ACKNOWLEDGED RESPONSIBILITY FOR PLAINTIFF'S MESOTHELIOMA

A-3642-14T1

POINT V
THE TRIAL COURT ERRED IN FAILING TO INSTRUCT
THE JURY, IN ACCORDANCE WITH ITS OWN PROPOSED
INSTRUCTIONS DISTRIBUTED TO COUNSEL BEFORE
SUMMATIONS, THAT DEFENDANTS HAD THE BURDEN OF
SHOWING THAT THE RESPONSIBILITY OF EACH
DEFENDANT FOUND LIABLE TO PLAINTIFF IS CAPABLE
OF APPORTIONMENT

POINT VI
THE TRIAL COURT ERRED IN INSTRUCTING THE JURY
THAT PLAINTIFF HAD THE BURDEN OF PROVING THE
LIABILITY OF BURNHAM FOR A PORTION OF
PLAINTIFF'S INJURIES EVEN THOUGH PLAINTIFF
SETTLED HIS CLAIM AGAINST BURNHAM BEFORE
SUBMISSION OF THE CASE TO THE JURY

## II.

Pecora argues plaintiffs have "not provided proofs sufficient to allow a reasonable factfinder to determine that [Condon] was exposed to any Pecora Cement, much less an amount of Pecora Cement which would be sufficient to cause harm." For this reason, Pecora contends the trial court erred in denying its pre-trial motion for summary judgment.

A court should grant summary judgment "forthwith" when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Under this standard, "a court should deny a summary judgment motion only where the party opposing the motion

has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 529 (1995) (quoting R. 4:46-2(c)). The "non-moving party cannot defeat a motion for summary judgment merely by pointing to any fact in dispute" if it is not material. Ibid.

This court reviews "a trial court's decision on summary judgment 'de novo, employing the same standard used by the trial court.'" Van Horn v. Harmony Sand & Gravel, Inc., 442 N.J. Super. 333, 340 (App. Div. 2015) (quoting Tarabokia v. Structure Tone, 429 N.J. Super. 103, 106 (App. Div. 2012)).

In an asbestos failure-to-warn case, the plaintiff must prove two types of causation: product-defect causation and medical causation. Hughes v. A.W. Chesterton Co., 435 N.J. Super. 326, 337 (App. Div. 2014). To reach a jury on the issue of medical causation, "a plaintiff only need produce evidence from which a fact-finder, after assessing the proof of frequency and intensity of plaintiff's contacts with a particular manufacturer's friable asbestos, could reasonably infer toxic exposure." Sholtis v. Am. Cyanamid Co., 238 N.J. Super. 8, 29 (App. Div. 1989).

Under the "frequency, regularity and proximity" test that our courts follow, a plaintiff who cannot establish direct causation from a specific product must "prove an exposure of sufficient

frequency, with a regularity of contact, and with the product in close proximity." Id. at 28 (citing Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1162-63 (4th Cir. 1986)); accord Hughes, 435 N.J. Super. at 345 (noting "liability should not be imposed on mere guesswork" and proof of specific asbestos-containing products at a workplace is insufficient alone, without proof linking those products to the plaintiff's exposure).

For purposes of this opinion, we will assume that very low levels of exposure can cause mesothelioma and that Condon's cumulative exposure over the years to all the asbestos-containing products he used caused him to develop the disease. Condon testified he used wet furnace cement on occasion that dried on his hands and created dust when it flaked off. If there was sufficient evidence for a jury to conclude some of that wet furnace cement was manufactured by Pecora and not by others, perhaps there would have been sufficient evidence to find Pecora liable. But no evidence establishes the necessary link between Condon and Pecora's wet cement to the extent required to demonstrate "frequency, regularity, and proximity. Sholtis, 238 N.J. Super. at 28-29.

The trial court ruled: (1) between 1973 and 1984, Condon worked on many Burnham boilers in the residential context; (2) these were packaged boilers and "the majority of them" came

packaged with cement; (3) installation involved the use of cement; and (4) Pecora "was the exclusive supplier of asbestos cement to Burnham." In our opinion, the record did not, even drawing all inferences in plaintiffs' favor, establish that Burnham boilers came packaged with cement and that Pecora was the exclusive supplier of asbestos cement to the company.

Condon testified he used premixed cement rather than dry cement, which was manufactured by DAP. Thus, the sole possible link between Condon and Pecora was Burnham, and a determination of Pecora's liability would have necessitated findings by the jury that (1) the Burnham boilers were shipped with trim kits, and (2) those trim kits included wet cement rather than dry cement. Plaintiffs' proofs did not establish these points as more likely than not.

The only evidence that could support a finding that Burnham included trim kits with any of the boilers that Condon installed was Condon's testimony that a majority of the various brands of boilers he installed included such kits. Regarding Burnham specifically, Condon recalled installing its residential packaged boilers, but he did not remember whether those boilers came with trim kits. Kendall, however, answered "[n]ot that I'm aware of" when asked whether asbestos cement was "supplied with Burnham's residential packaged boilers" in the relevant time frame. Thus

20

neither Condon nor Kendall established a connection between Pecora and Condon's disease.

Even assuming a jury could conclude it was more likely than not that the Burnham boilers Condon installed included trim kits, the evidence did not establish those trim kits contained wet cement rather than dry cement. Condon testified the asbestos cement typically came in a powder he had to mix with water before use. He acknowledged he could not say, without speculating, that Burnham provided a paste product to use instead. Kendall's testimony was that Burnham purchased "7M" dry asbestos cement. Therefore, if any trim kits supplied by Burnham to Condon would have included a dry product. The jury had no basis to conclude it was more likely than not that Burnham trim kits, atypically, included wet cement manufactured by Pecora.

Along the same lines, Kendall's testimony does not support a finding that Burnham ever provided wet cement for use in installing packaged boilers like those installed by Condon. Kendall said wet cement was used on "[b]asically residential" boilers, but added he did not know whether they were sectional or packaged boilers, and in any event it was not clear from this portion of his testimony whether the cement was used solely within the Burnham plant. Later, however, Kendall specifically recalled Burnham purchased "larger cans" of Pecora cement for use on the "[p]roduction line."

21

Kendall acknowledged Burnham purchased twelve cartons of smaller cans of Pecora cement to be "shipped out for repairs or assembly out in the field" specifically for a "special model PF-5" boiler. However, there is no evidence linking Pecora cement to any other model of Burnham boiler "out in the field" and no evidence linking Condon to this single model of Burnham boiler. Condon testified he did not perform "repairs" on boilers.

Even drawing all inferences in plaintiffs' favor, the jury would have had no basis to conclude it was more likely than not that the Burnham boilers Condon installed were packaged with Pecora cement. Accordingly, the trial judge should have granted summary judgment to Pecora. See R. 4:46-2(c).

III.

Because we find the court should have granted summary judgment, we do not reach Pecora's points of error on appeal regarding punitive damages. Nor do we reach the issues raised by plaintiffs by way of cross-appeal. There was no genuine issue as to any material fact. Pecora was entitled to a judgment as a matter of law.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3642-14T1