825 A.2d 524 (2003)
361 N.J. Super. 264
O'BRIEN (NEWARK) COGENERATION, INC., Plaintiff-Appellant/Cross-Respondent,
v.
AUTOMATIC SPRINKLER CORPORATION OF AMERICA, Defendant-Respondent/Cross-Appellant, and
Hawker-Siddeley Power Engineering, Inc., Hawker-Siddeley Group, Public Limited Company (PLC), BTR, PLC f/k/a BTR Dunlop, PLC, As successor in interest to Hawker-Siddeley Power Engineering, Inc., and Hawker-Siddeley Group, PLC, Invensys Inc., As successor in interest to BTR, PLC, f/k/a BTR Dunlop, PLC, John Brown Power Limited, John Brown PLC, GEC Alsthom International, Inc., and/or GEC Alsthom Electro Mechanique, Kleber Industries, Belmont Constructors, Inc., and Agmen, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 2003.
Decided June 24, 2003.
*526 Michael J. Izzo, Jr., Westmont, argued the cause for appellant/cross-respondent (Cozen & O'Connor, attorneys; Mr. Izzo, Thomas McKay, III, Cherry Hill, and Lawrence F. Walker, Philadelphia, PA, on the brief).
Martin G. Picillo, West Orange, argued the cause for respondent/cross-appellant (Picillo & Caruso, attorneys; Mr. Picillo, on the brief).
Before Judges SKILLMAN, CUFF and LEFELT.
*525 The opinion of the court was delivered by LEFELT, J.A.D.
Plaintiff O'Brien (Newark) Cogeneration, Inc. was the owner of a cogeneration plant which caught fire in 1992 causing the death of three employees and significant property damage. Plaintiff appeals from an order dismissing its suit seeking recovery for the plant's repair costs, expedited labor costs, and lost profits from defendant Automatic Sprinkler Corporation of America (ASCOA). We affirm the trial court's dismissal of plaintiff's claim for repair costs, but reverse the dismissal of plaintiff's lost profits and expedited labor cost claims and remand for trial on those claims.

*527 I.
Between 1988 and 1990, at a cost of $40,952,000, plaintiff built a 90-by-161-foot multi-story cogeneration plant in Newark, which was expected to last thirty to fifty years. To build this plant, plaintiff hired various engineers and construction companies including ASCOA and GEC Alsthom International, Inc. and GEC Electro Mechanique (collectively referred to as Alsthom). Alsthom manufactured and supplied steam turbine equipment and related piping, expansion joints and other equipment for the plant. ASCOA was to provide a fire protection and detection system for the plant, including "an automatic firewater deluge system for the lube oil unit, hydraulic unit and gear box for the ... Alsthom ... steam turbine/generator." Before beginning operations in November 1990, plaintiff hired defendant John Brown, a professional operation company, to run and maintain the plant.
On December 25, 1992, an oil fire began in the plant. According to the fire investigator, a rubber expansion joint in the steam turbine's lube oil system, which had been manufactured by Alsthom, separated. A fine mist of heated oil sprayed into the air and then flowed onto the floor beneath a 600 square foot table-like concrete pedestal that supported the steam turbine. Within a short time, as the joint continued to break down, the mist turned into a steady flow of oil which fell directly onto the floor below the pedestal. This oil became combustible as it mixed with the air, and subsequently ignited in a low order explosion at the joint which set the oil-slicked floor on fire, damaged an aluminum door and blew in the windows in the nearby control room, coating everything inside with oil.
No sprinklers had been installed under the pedestal even though that area housed the lube oil pump and numerous supply and return lines, and even though the most common hazard in a power generating plant is lube oil leakage. Plaintiff contended that because of the absence of sprinklers or a deluge water spray system that could discharge a high volume of water necessary to put out an oil fire, the fire under the approximately thirty-by-twenty-foot pedestal was not contained and progressed through the plant as the burning oil flowed away and down toward a slightly depressed corner of the plant.
To make matters worse, five days before the fire, one of the roof sprinkler heads had discharged above a gas turbine exhaust duct. To prevent flooding and icing in the plant, John Brown employees closed the water supply valve, which also eliminated the water supply to the remainder of the closed head roof sprinkler system, including that portion above the steam turbine where the fire started, at the opposite end of the plant. Repair of the sprinkler head and restoration of the water supply to the roof sprinkler system was not accomplished in the five days before the fire. Thus, these sprinklers could not activate to contain the fire.
Several battalions from the Newark Fire Department were needed to get the fire under control. Notwithstanding their efforts, three Brown employees inside the plant lost their lives and the plant sustained significant damage. Numerous pieces of equipment beneath the steam turbine had been destroyed. Virtually all of the thirty miles of cabling and wiring in the plant was beyond repair. Much of the roof and some of its support beams needed replacement. The equipment contained in the water purification station was a total loss. Numerous pieces of office equipment had been destroyed and everything in the plant had been coated with an oily soot residue.
*528 According to plaintiff's accountant, the total cost to repair the plant was $26,453,936. Utilizing historical data and taking into account saved operating expenses, the accountant determined that plaintiff had also sustained $9,248,850 in lost profits during the time it took to repair the plant.
As part of the total repair costs, plaintiff incurred $5,359,000 in additional labor costs for expediting the repairs, which according to plaintiff were necessary to avoid breaching plaintiff's long-term power purchase agreement with its sole electric customer, Jersey Central Power & Light (JCP & L). Under this agreement, JCP & L agreed to buy from plaintiff 1248 megawatts of electricity per day over twenty-five years. This agreement provided that a breach would occur if "the Seller fails to deliver Electricity for 240 out of 365 consecutive days ... for any reason other than force majeure." The agreement defined force majeure as "unforeseeable causes beyond the reasonable control of and without the fault or negligence of [plaintiff] including ... fire ... which by exercise of due foresight such party could not reasonably have been expected to avoid, and which by the exercise of due diligence it is unable to overcome." When JCP & L failed to confirm that it believed the fire to be a force majeure under the contract, plaintiff expedited the repairs and succeeded in recommencing the generation of electricity in less than 240 days.
Plaintiff began suit against several defendants including John Brown, Alsthom, and ASCOA to recover its repair and labor costs and lost profits. Plaintiff settled with most defendants, but proceeded to trial against Alsthom and ASCOA. After plaintiff rested its case, the trial judge dismissed plaintiff's entire complaint against ASCOA because the judge concluded that plaintiff was required to apportion its damages caused by ASCOA's failure to provide sprinklers under the turbine pedestal. The judge also ruled that the additional labor charges were unreasonably incurred and she removed from consideration by the jury plaintiff's labor cost claim against Alsthom. During the presentation of the defense case, plaintiff settled its dispute with Alsthom. Plaintiff then appealed from the trial court's dismissal of its suit against ASCOA.
On appeal plaintiff argues that the trial judge erred by (1) dismissing the complaint against ASCOA at the close of plaintiff's case for failure to apportion damages among the defendants, (2) precluding expert testimony regarding the reasonableness of the property repairs, and (3) excluding proofs pertaining to the labor costs incurred to expedite repairs.
ASCOA has cross-appealed, claiming that while the court was correct when it precluded plaintiff's evidence attempting to establish the reasonableness of the property repairs, it erred by failing to dismiss the claim for repair costs. Thus, ASCOA argues in the cross-appeal that while it does not disagree with the trial court's dismissal of plaintiff's entire complaint, the court alternatively could have also dismissed plaintiff's repair cost claim for failure to establish the reasonableness of its repairs. Technically, this is not a cross-appeal because a responding party is permitted to argue in opposition to the appeal any alternative basis for partial or full affirmance of the trial court's judgment. See Kimball Intern., Inc. v. Northfield Metal Prods., 334 N.J.Super. 596, 604, 760 A.2d 794 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001). Nevertheless we address ASCOA's argument in the cross-appeal as well as all of plaintiff's arguments in the main appeal within the context of the three damage claims wherein plaintiff seeks recovery of *529 $26,453,936 in repair costs, $9,248,850 in lost profits and $5,359.000 in expedited labor charges.
[At the direction of the court, Sections II and III, dealing with plaintiff's repair costs and lost profits, are omitted from the published version of this opinion.]

IV. Expedited Labor Costs

A. Force Majeure
The trial judge struck plaintiff's claim for expedited labor costs because she concluded that a force majeure exempted plaintiff from the JCP & L contract clause which deemed a breach to exist if plaintiff "fails to deliver Electricity for 240 out of 365 consecutive days." Because plaintiff was not at fault for the fire and there was no definitive rejection of the force majeure argument by JCP & L, according to the trial court, there was no reasonable basis for expediting the plant repairs.
We must enforce non-ambiguous contracts as written and not make a better contract for either party. Schenck v. HJI Assocs., 295 N.J.Super. 445, 450, 685 A.2d 481 (App.Div.1996), certif. denied sub nom. Schenck v. Bailey, 149 N.J. 35, 692 A.2d 48 (1997). Nevertheless, to understand the parties' intent and the nature of their agreement, we must consider the surrounding circumstances and relationships of the parties at the time of the contract. Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282-83, 633 A.2d 531 (1993).
Under this agreement, not all fires were automatically considered force majeure events. Rather, the agreement stated that all qualifying events had to have been "unforeseeable" and "beyond the reasonable control of and without the fault or negligence of [plaintiff]." In addition, the parties further defined force majeure as an event "which by exercise of due foresight such party could not reasonably have been expected to avoid, and which by the exercise of due diligence it is unable to overcome." This language does not make it easy to determine whether a particular fire would be a force majeure event.
In fact, the contract language leads us to conclude that it was not possible to determine whether a particular fire was a force majeure until the cause of the catastrophe was established. Thus, the parties could not have intended that the issue of force majeure be resolved immediately after the event. Here, for example, the fire inspector spent five months completing his investigation into the cause of the fire, may explain why JCP & L did not respond to plaintiff's timely notification of the fire.
Therefore, a jury could have found that plaintiff, aware that a determination as to the cause of the fire could take a considerable amount of time and that the plant repairs would take more than 240 days to complete under normal circumstances, acted reasonably in expediting the repairs so as to avoid the consequences of a later default.
One who suffers harm by another is permitted to recover, as part of its damages, the reasonable cost of measures taken to prevent future injury. See Diamond Shamrock Chems. Co. v. Aetna Cas. and Sur. Co., 231 N.J.Super. 1, 12, 554 A.2d 1342 (App.Div.1989); Restatement (Second) of Torts, § 919(2) ("one who has already suffered injury by the tort of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert further harm.").
In addition, plaintiff was under a legal duty to mitigate its damages. McDonald v. Mianecki, 79 N.J. 275, 299, 398 A.2d 1283 (1979); McGraw v. Johnson, 42 N.J.Super. 267, 273, 126 A.2d 203 (App. Div.1956). Plaintiff expedited the plant repairs not only to avoid breaching its *530 contract with JCP & L but also to minimize its lost profits. Accordingly, we conclude that it should have been left to the jury to decide whether plaintiff acted reasonably by continuing to expedite repairs without pressing JCP & L to declare its position regarding force majeure.

B. Apportionment of Damages
ASCOA contended that plaintiff had an obligation to segregate those labor charges that related exclusively to expediting repair of property damaged by a particular defendant's negligence. According to ASCOA, plaintiff had to provide evidence that linked a defendant's negligence with the expedited repair and the resulting enhanced labor charge.
The trial court agreed with ASCOA that it was plaintiff's burden to apportion the damages attributable to ASCOA's alleged negligence. The court concluded that "it is the plaintiff's burden to prove each and every element of its damages and how it breaks down." Thus, the court dismissed plaintiff's claim against ASCOA despite plaintiff's proofs that the combined negligence of ASCOA and other defendants clearly caused property damage to the plant.

1. Applicable Apportionment Law
It is generally plaintiff's burden to prove not only that defendant was negligent, but also that defendant's negligence was a proximate cause of the injuries and damages suffered. Paxton v. Misiuk, 34 N.J. 453, 463, 170 A.2d 16 (1961). "Apportionment of damages based on causation has [long] been favored" by courts in this State. Poliseno v. Gen. Motors Corp., 328 N.J.Super. 41, 55, 744 A.2d 679 (App.Div.) (citing Campione v. Soden, 150 N.J. 163, 184, 695 A.2d 1364 (1997)), certif. denied, 165 N.J. 138, 754 A.2d 1213 (2000). Thus, plaintiff, generally, must apportion or relate damages to defendant's wrongful acts. If proofs establish that plaintiff's injuries, for example, pre-existed and were unconnected with defendant's negligence, then defendant is not responsible for the pre-existing injuries. Ibid. A defendant should be responsible only for "the value of the interest he [or she] destroyed." Scafidi v. Seiler, 119 N.J. 93, 112, 574 A.2d 398 (1990).
In the normal prior or post-personal injury aggravation claim, the party in the best position to present evidence of non-aggravation or exacerbation is plaintiff. Plaintiffs should understand and appreciate whether and how a defendant's tort may have affected their prior or post injuries or conditions. The effect on plaintiff of defendant's tort is uniquely within plaintiff's knowledge. Thus, in a routine personal injury aggravation claim, we do not shift the burden to defendants and to prevail, plaintiffs must separate those damages caused by a particular defendant's negligence from any prior or post injuries or conditions. E.g., Blanks v. Murphy, 268 N.J.Super. 152, 162, 632 A.2d 1264 (App.Div.1993); Tisdale v. Fields, 183 N.J.Super. 8, 10-11, 443 A.2d 211 (App. Div.1982). Therefore, the routine aggravation of personal injury or condition case represents the normal rule, cited by the trial judge, that plaintiffs must prove what damages a particular defendant caused. Paxton v. Misiuk, supra, 34 N.J. at 463, 170 A.2d 16.
It is important to realize that when the burden is on plaintiff to apportion damages between particular defendants and prior or subsequent injuries or conditions, the result of failure to carry the burden may be dismissal of plaintiff's case. So, for example, in Hill v. Macomber, 103 N.J.Super. 127, 137, 246 A.2d 731 (App. Div.1968), we cited an 1829 Vermont case, where an owner of sheep suffered loss to *531 the flock by two separately owned dogs. In the absence of any testimony as to which dog killed which sheep, neither owner was held liable. Adams v. Hall, 2 Vt. 9 (1829).
The dismissal of such a case for failure to prove damages is difficult to accept especially when the injured plaintiff is completely innocent of any comparative negligence and defendant appears to have clearly caused some injury to plaintiff. To ameliorate this potential injustice, we shift the burden of apportioning injuries so as not to cause an otherwise entirely innocent plaintiff who has clearly suffered some injury at the hands of a defendant to go uncompensated. E.g., Scafidi v. Seiler, supra, 119 N.J. at 112-13, 574 A.2d 398; Fosgate v. Corona, 66 N.J. 268, 272-73, 330 A.2d 355 (1974); Bendar v. Rosen, 247 N.J.Super. 219, 232, 588 A.2d 1264 (App. Div.1991); Lewis v. Preschel, 237 N.J.Super. 418, 423, 568 A.2d 106 (App.Div.1989); Hudgins v. Serrano, 186 N.J.Super. 465, 472, 453 A.2d 218 (App.Div.1982); Thornton v. Gen. Motors Corp., 280 N.J.Super. 295, 301, 655 A.2d 107 (Law Div.1994). Often, the burden is shifted to defendants with more expertise or better access to relevant apportionment proofs. E.g., Lanzet v. Greenberg, 126 N.J. 168, 189, 594 A.2d 1309 (1991) (medical malpractice); Ostrowski v. Azzara, 111 N.J. 429, 439, 545 A.2d 148 (1988) (medical malpractice); Fosgate, supra, 66 N.J. at 268, 330 A.2d 355 (medical malpractice); Nopco Chem. Div. v. Blaw-Knox Co., 59 N.J. 274, 282-83, 281 A.2d 793 (1971) (bailment damage to commercial drying machine); Green v. Gen. Motors Corp., 310 N.J.Super. 507, 528-29, 709 A.2d 205 (App.Div.1998) (products liability); Sholtis v. Am. Cyanamid Co., 238 N.J.Super. 8, 27-28, 568 A.2d 1196 (App.Div.1989) (asbestos exposure); and Hoppe v. Ranzini, 158 N.J.Super. 158, 171, 385 A.2d 913 (App.Div.1978) (legal malpractice).
Besides shifting the apportionment burden to knowledgeable defendants in order to protect completely innocent plaintiffs, we have also shifted this burden when innocent plaintiffs suffer a unitary harm caused by concurrent wrongs. "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor." Restatement (Second) of Torts, § 433B(2) (1965); see also Dafler v. Raymark Indus., Inc., 259 N.J.Super. 17, 33, 611 A.2d 136 (App.Div.1992), aff'd, 132 N.J. 96, 622 A.2d 1305 (1993); Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1152 (3d Cir.1990); but see Feldman v. Lederle Labs., 257 N.J.Super. 163, 174, 608 A.2d 356 (App.Div.1992) (distinguishing Sholtis, by finding that the plaintiff in Feldman suffered an "incremental injury" rather than a "unitary or indivisible injury").
The reason for shifting the burden in the case of a unitary injury is to prevent "the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers." Restatement (Second) of Torts, supra, § 433B comment d on subsection (2). "As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." Ibid.
Therefore, when plaintiffs suffer a unitary harm at the hands of multiple defendants, the defendants causing the injury are jointly and severally responsible unless the defendants can apportion the *532 harm. Goodman v. Fairlawn Garden Assocs., Inc., 253 N.J.Super. 299, 305, 601 A.2d 766 (App.Div.), certif. denied, 130 N.J. 7, 611 A.2d 647 (1992); Daniel v. State Dep't. of Transp., 239 N.J.Super. 563, 595, 571 A.2d 1329 (App.Div.), certif. denied, 122 N.J. 325, 585 A.2d 343 (1990).
In Sholtis v. Am. Cyanamid Co., supra, 238 N.J.Super. at 8, 568 A.2d 1196, for example, plaintiff was exposed to several asbestos-containing products manufactured by separate defendants, and it was defendants' burden to minimize or eliminate its concurrent contribution to the harm at the risk of being found jointly responsible for plaintiff's condition. Id. at 30, 568 A.2d 1196. Once the burden is shifted, the culpable defendant is responsible for all the damages unless defendant can demonstrate that the damages are capable of some reasonable apportionment and what those damages are. Dafler, supra, 259 N.J.Super. at 33, 611 A.2d 136.
Most of the cases dealing with shifting the apportionment burden involve personal rather than property injuries. In Borough of Fort Lee v. Banque Nat'l de Paris, 311 N.J.Super. 280, 290, 710 A.2d 1 (App.Div. 1998), however, a commercial business owner's loss of income associated with a partially vacant building was aggravated by a tenant holding over after its tenancy. Although we found that this was not a case where the burden of apportioning damages should be shifted to defendant, we recognized the potential applicability of the burden shifting doctrine in a non personal injury context. Id. at 289-90, 710 A.2d 1; see also Nopco Chem. Div. v. Blaw-Knox Co., supra, 59 N.J. at 282-83, 281 A.2d 793 (involving property damaged during bailment).

2. Application of Facts to Apportionment Law
Thus, there are three factors present in the cases that shift the damage apportionment burden to defendants. These factors are plaintiff's innocence, more knowledgeable defendants, and a unitary harm caused by concurrent misconduct. Contrary to ASCOA's argument, all of these factors are present in this case and require that the apportionment burden be shifted to defendants.
Regarding plaintiff's innocence, we note that plaintiff was an off-site owner of the plant and was not present in the plant when the fire began. Plaintiff in fact had hired Brown to manage, maintain, and operate the plant reasonably and safely. In building the plant, plaintiff had relied on third party contractors and manufacturers ostensibly with the necessary expertise to provide and install the equipment needed to operate the plant efficiently and safely. Plaintiff alleged and provided proofs that Brown, ASCOA and Alsthom failed in their obligations and negligently caused damage to the plant. At the time plaintiff's case was dismissed, there was no evidence in the record that plaintiff was anything other than an innocent victim of the concurrent torts that resulted in the plant fire. In fact, the trial judge in ruling on one of the other issues, noted that plaintiff was innocent of any wrongdoing.
ASCOA argues that plaintiff was more knowledgeable regarding apportionment proofs than defendants or at best plaintiff and defendants were equally situated. In this case, however, no eye witness to this fire survived. No person was able to describe from personal observation how this fire began and eventually consumed much of the plant. Both plaintiff and defendants had equal access to the fire investigations that were performed. The defendants, however, had better understanding and access to the materials, equipment and procedures that were employed in operating *533 the plant, including any limitations on the equipment, products, and procedures. While plaintiff did not segregate the various invoices by plant area or by pre-fire and post-fire damages, all of the invoices for the labor and repair charges were available to all defendants and were present in court. Consequently, we believe that while both plaintiff and defendants were equally capable of sorting the various expenditures, the defendants were better situated to interpret the fire investigations and attempt to limit the role their various materials, equipment, and systems may have played in this catastrophe.
Plaintiff's proofs indicated that ASCOA's negligence combined with the negligence of Alsthom, Brown, and other defendants to cause fire loss throughout the plant. According to ASCOA, however, the plaintiff did not suffer a unitary harm because the absence of a sprinkler system under the concrete pedestal in no way contributed to the initial oil leak and explosion which caused some damage besides fire damage. In addition, the trial court seemed to believe that plaintiff's proofs merely showed that the plant would have sustained "less" fire damage had a deluge system been installed under the concrete pedestal, where the fire started. Thus, the court apparently concluded that the harm suffered by plaintiff was not unitary but instead was divisible.
There is nothing in the record to suggest that the fire simultaneously ignited away from the area which would have been protected by the omitted deluge system, or that this deluge system would not have extinguished the fire completely before it had the opportunity to spread, such that it can be said that there were two distinct fires here. Rather, testimony indicated that a properly designed sprinkler system, including a deluge head under the turbine pedestal, "would have extinguished that fire." Testimony also demonstrated that once the oil mist ignited at the joint, the fire developed under the pedestal and then spread to other parts of the plant.
ASCOA claimed at oral argument that besides the window and door damage, there was also oil damage throughout the plant that was not its responsibility. Because we are reviewing a ruling by a trial judge granting a motion for judgment to defendant at the close of plaintiff's case, however, we must "accept[] as true all the evidence which supports the [plaintiff's] position ... and must accord[ ] [plaintiff] the benefit of all inferences which can reasonably and legitimately be deduced therefrom," in determining whether a cause of action has been made out. Dolson v. Anastasia, 55 N.J. 2, 5, 258 A.2d 706 (1969). We are also not concerned with the weight, worth, nature or extent of plaintiff's evidence, only its existence. Id. at 5-6, 258 A.2d 706.
Plaintiff's proofs seemed to indicate that ASCOA did not contribute to the initial oil leak and subsequent explosion which damaged the control room and an overhead aluminum door just prior to the fire. These damages, however, were quite minimal when compared with the post-fire damages that affected the entire plant with heat, oily soot and smoke and required millions of dollars to repair. While the pre-fire damages might have been separable from the post-fire damages, plaintiff's evidence provided no basis to conclude that the post-fire damages were further divisible. See Rozark Farms, Inc. v. Ozark Border Elec. Coop., 849 F.2d 306, 310 (8th Cir.1988) (loss as a result of fire has traditionally been classified as a type of damage not reasonably capable of apportionment between more than one cause).
Thus, an innocent plaintiff in this case sustained unitary harm by way of fire *534 damage to the entire plant and because ASCOA was jointly responsible with the other defendants for this damage and because it was more knowledgeable than plaintiff about its fire suppression system, it bore the burden of limiting by apportionment its otherwise joint responsibility.
We see no reason why the apportionment burden should not be shifted in this case where all of the fire damage suffered by an apparently innocent plaintiff was caused by the concurrent negligence of multiple defendants, who were responsible for plant maintenance and installation of the various equipment, machines, and systems that were involved in the fire. The trial court should have shifted the apportionment burden rather than dismissing plaintiff's case. Therefore, at the new trial, it shall be ASCOA's burden to attempt apportionment of any expedited labor costs that may conceivably be related solely to the negligence of others.

V.
In conclusion, we reverse the trial court's decision precluding plaintiff's claims for lost profits and expedited labor charges and direct a new trial during which plaintiff may seek recovery against ASCOA for these losses. We affirm the trial court's dismissal of plaintiff's claim for repair costs. Plaintiff's new trial shall, therefore, be limited to its lost profits and labor cost claims. We dismiss ASCOA's cross-appeal.