**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3434-19

IN SIM HWANG,

    Plaintiff-Appellant,

v.

SHAUNE M. GORDON and
FINANCIAL PACIFIC LSN, INC.,

    Defendants-Respondents.

_____

Submitted November 17, 2021 – Decided January 14, 2022

Before Judges Hoffman, Whipple, and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5791-18.

Jae Lee Law, PC, attorneys for appellant (Martin S. Cedzidlo, on the brief).

Tompkins, McGuire, Wachenfeld & Barry, LLP, attorneys for respondents (Joseph K. Cobuzio, of counsel; Jared P. DuVoisin and Jennifer A. Kelliher, on the brief).

PER CURIAM

In this auto-accident case, plaintiff appeals from an April 28, 2020 Law Division order granting summary judgment in favor of defendants and dismissing her complaint with prejudice. We reverse and remand.

I.

We derive the following facts from the record. Plaintiff has been involved in four motor vehicle accidents: one in 1997 (the 1997 accident), one in 2011 (the 2011 accident), one on February 22, 2017 (the subject accident), and one on December 16, 2017 (the later accident).[1]

Plaintiff alleges that on February 22, 2017, while driving southbound on Route 9W in Piermont, New York, a car driven by defendant Shaune M. Gordon (defendant), and owned by defendant Financial Pacific LSN, Inc., struck plaintiff's stopped car from behind, pushing her vehicle "approximately 100 [to] 150 feet from [the] point of impact."

In her answers to interrogatories, plaintiff claimed she sustained the following permanent injuries in the subject accident:

- Disc herniation at L3-4.

---

[1] According to plaintiff, her 1997 accident occurred in South Korea, in approximately 1997, with her "sustain[ing] low back injuries[,] which required fusion surgery." The 2011 accident occurred in Ridgefield on December 30, 2011, when another vehicle struck plaintiff's car from behind.

- Disc herniation at C4-5, C5-6.
- Ulnar[-]sided tear of the TFCC,[2] right wrist.

- Partial tear of the supraspinatus tendon, and tear of the superior labrum, and partial tear of the rotator cuff/supraspinatus right shoulder.

- Bilateral C5, C6, L5 and S1 radiculopathy.

- Cervical sprain/strain.

- Lumbar sprain/strain.

- Thoracic sprain/strain.

- Bilateral shoulder sprain/strain.

---

[2] According to the American Society for Surgery of the Hand,

The Triangular Fibro[-]Cartilage Complex, or TFCC, is an important structure in the wrist. The TFCC is made of tough fibrous tissue and cartilage. This tissue supports the joints between the end of the forearm bones (radius and ulna), adding to their stability. The TFCC also helps connect the forearm with the small bones in the ulnar side ("pinkie finger" side) of the wrist.

[TFCC Tear: Causes and Symptoms, AMERICAN SOCIETY FOR SURGERY OF THE HAND, https://www.assh.org/handcare/condition/tfcc-tear (last visited Jan. 6, 2022).]

A-3434-19

While plaintiff acknowledged she previously received "treatment for injuries, and had surgery, to her lumbar and cervical spine," she did not assert a claim that the subject accident aggravated any previously sustained injuries.

During discovery, plaintiff produced reports from two doctors: Dr. Marc S. Arginteanu, a neurosurgeon, and Dr. Sanford R. Wert, an orthopedic surgeon. Dr. Arginteanu addressed plaintiff's spinal injuries, while Dr. Wert described plaintiff's shoulder injuries. We address the reports of these doctors in turn.

A.  Dr. Arginteanu

We begin with a review of treatment Dr. Arginteanu rendered to plaintiff following her 2011 accident. In a report dated April 15, 2013, Dr. Arginteanu stated that plaintiff suffered multiple herniated discs, including a herniated disc at L4-L5, as a result of the December 2011 accident. He recounted that plaintiff "underwent surgery in December 2012 . . . . consist[ing] of removal of some of the old screws that she had placed in Korea" and "reconstruction of the [lumbar] spine with screws, rods, and bone graft, removal of the disc, and replacement with a carbon fiber cage at the L4-L5 level." In conclusion, Dr. Arginteanu opined, "It is my belief that [plaintiff] will require surgery in the future regarding the cervical spine which will be similar in nature to the lumbar spine surgery"

4

and "she additionally will have some element of permanency in the following manner":

> She has permanent implantations of internal fixation devices including screws, rods, and disc replacement cages in the lumbar spine.
>
> Additionally, she has permanency on the basis of her pain despite it being six months after surgery she still has pain in the lumbar spine which persists.
>
> Her prognosis at this point is guarded for complete recovery. I do think she will need further surgery. Furthermore, if further surgery is needed [on] the cervical spine, I do believe it is on the basis of the motor vehicle accident that is captioned above.

Following the subject accident in February 2017, Dr. Arginteanu issued a report dated March 25, 2019, wherein he noted he has "had a long association with [plaintiff,]" having "initially known [her] due to an accident she had suffered in the past[,] which resulted in her requiring surgery upon the lumbar spine for decompression, fusion, and instrumentation." According to Dr. Arginteanu, plaintiff's "underlying spinal condition . . . was exacerbated by [the subject] accident." His report recounted:

> Immediately after [the subject] accident[,] [plaintiff] began to have pain both in the cervical and in the lumbar spine. The pain in the cervical and lumbar spine radiated down four extremities. She had complaints of

A-3434-19

numbness and weakness. She had dysfunction of her hands. She had gait difficulty.

In March of 2017, I examined her in the office and found her to have a broad-based gait, a positive Romberg sign (when she closed her eyes she swayed and almost fell over). She had tenderness and muscular spasms throughout the spine. She had numbness of the extremities and weakness of several muscular groups: Biceps and triceps on the left upper extremity and quadriceps in the right lower extremity.

Based upon her symptoms, I performed further imaging studies[,] including MRI scans at Englewood Hospital and saw her back in the office approximately one month later (April 2017). In the office visit in April, I found that her examination deteriorated with worsening myelopathic reflexes (indicating spinal cord compression).

My personal review of her MRIs of the spine revealed disc herniation at C4-C5 and C5-C6[,] with stenosis of the spine at C4-C5 and C5-C6.

Additionally, I reviewed an MRI of her lumbar spine that revealed bulging disc with stenosis at multiple levels[,] worst at L3-L4 (the level above the previous surgery).

Dr. Arginteanu opined the subject accident's "exacerbation of the underlying condition caused her to need surgery on the cervical spine" and "on the lumbar spine." Dr. Arginteanu performed the surgeries, which he described as follows:

6

On August 10, 2017, the patient underwent an anterior cervical discectomy with removal of the discs between C4 and C5 as well as C5 and C6 and replacement of these discs with cages and bone graft and internal fixation of the spine with titanium plate and screws at C4, C5, and C6.

On the date of August 24, 2017, she underwent lumbar decompression, fusion, and instrumentation with removal of the disc between L3 and L4, removal of laminar bone between L3 and L4, replacement of the disc with a cage and bone graft and placement of titanium screws and rods in the lumbar spine.

Following the surgeries, Dr. Arginteanu "saw [plaintiff] on multiple occasions after these major spinal reconstructions of the cervical and lumbar areas. Although she was better than before surgery[,] she was still worse than before the motor vehicle accident that she sustained on February 22, 2017." He ultimately opined that plaintiff:

will have permanency both in the cervical and in the lumbar spine. She will have permanent implantation of internal fixation devices, permanent limitation in mobility of the spine, and permanent abnormality in the anatomy of the spine. This permanency is due to the exacerbation, which, in turn is due to the accident of February 22, 2017.

After the later accident occurred on December 16, 2017, about ten months after the subject accident, Dr. Arginteanu continued to evaluate and treat plaintiff. In a "Neurosurgical Follow-Up" report dated March 28, 2018, Dr.

Arginteanu documented that "[i]mmediately after the [later accident, plaintiff] had an exacerbation in her lower back pain[,] as well as exacerbation of the cervical spinal pain." However, he found X-rays of plaintiff showed there were "no complications of internal fixation devices[,]" with MRI testing on March 28, "look[ing] fine through the areas of surgery[;]" however, he did note "disc derangement" at L2-3. At the time, Dr. Arginteanu recommended "further nonsurgical care including physical therapy . . . and . . . potentially epidural injections"; however, he acknowledged surgery may be indicated if her condition does not improve.

### B. Dr. Wert

Dr. Wert prepared a narrative report dated September 9, 2019, concerning plaintiff's shoulder injuries sustained in the subject accident. Dr. Wert diagnosed plaintiff with a "SLAP[3] tear" and "[p]artial supraspinatus tendon tear," both in her right shoulder, and "state[d] with a reasonable degree of medical certainty that the injury to her right shoulder is causally related to the

---

[3] According to the Cleveland Clinic, a SLAP tear occurs when a person tears the cartilage in the inner part of the shoulder joint. SLAP Tear, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/21717-slap-tear (last visited Jan. 6, 2022). "Superior Labrum, Anterior to Posterior tears (SLAP tears), also known as labrum tears, represent 4 to 8 [percent] of all shoulder injuries." Ibid.

A-3434-19

[subject accident]."  The report provided the following history and findings about the injuries plaintiff sustained in the subject accident:

MEDICAL TREATMENT:

Following the accident, [plaintiff] came under the care of clinicians at New Jersey Prime Clinic[,] where she received physical therapy, chiropractic treatment and acupuncture treatment.  MRI of the right shoulder performed on 8/14/17 revealed a partial tear of the supraspinatus with tendinosis and a [SLAP] tear.

Due to continued pain and positive MRI of the right shoulder, [plaintiff] was referred to my New Jersey office for orthopedic consultation.  Examination of the right shoulder on 9/8/17 revealed significant decreases in range of motion with positive Hawkins and O'Brien tests.  I recommended arthroscopic surgery of the right shoulder and [plaintiff] agreed.  [Plaintiff] was involved in another accident on 12/16/17 and re-injured her right shoulder.  Arthroscopy was performed on 8/16/18.

IMPRESSION:

[Plaintiff] injured her right shoulder in a motor vehicle accident on 2/22/17.  I can state with a reasonable degree of medical certainty that her injury to her right shoulder is causally related to the motor vehicle accident on 2/22/17.

With a reasonable degree of medical certainty, I can state that the injury to the right shoulder is a permanent one and [plaintiff] will not return to pre-accident status.

Dr. Wert continued to treat and evaluate plaintiff after her later accident, in December 2017. Following an office visit on August 7, 2018, Dr. Wert noted:

> [Plaintiff] presents today for follow-up evaluation of the right shoulder and right knee injury, sustained as a result of the [later accident]. The patient underwent arthroscopy surgery of the right knee on 5/4/18[;] at this time[,] she has slight pain but is improving. Presently she complains of continued pain in the right shoulder. This injury was an aggravation of a previous re-injury due to [the subject accident].

Dr. Wert set forth the following diagnoses and recommendations:

> Findings: MRI both pre[-] and post[-]accident are similar (partial supraspinatus tear). The patient . . . is very symptomatic in her right shoulder. Although MRI shows no interval change, the patient is still in need of treatment to the right shoulder.
>
> Disability: the patient has significant pain and limitations in the right shoulder. She is given an estimate[d] disability of [twenty-five percent] for [the subject] accident and [seventy-five percent] disability from [the later] accident[.]
>
> Recommendations: The patient was recommended to consider undergoing a surgical procedure of the right shoulder, due to patient's present and ongoing symptomatology, positive objective findings on examination, and unfavorable response to conservative treatment. . . . The patient agreed to this option and surgery was scheduled on 8/15/18. . . .

Plaintiff filed suit against defendants in August 2018. After discovery closed on February 4, 2020, defendants moved for summary judgment. On April

10

28, 2020, the motion judge granted defendants' motion and ordered plaintiff's complaint "dismissed in its entirety with prejudice pursuant to <u>Rule</u> 4:46." The judge issued a six-page "rider to the order" setting forth his reasons for granting summary judgment to defendants. The judge stated that because plaintiff "experienced a low back injury in the [1997 accident] and the [2011 accident]," plaintiff was required to "produce comparative evidence to move forward with the causation element of [her] tort action." The judge found plaintiff's two experts, Dr. Wert and Dr. Arginteanu, failed to provide a sufficient comparative analysis to establish causation and damages. Thus, the judge found, after giving all favorable inferences to plaintiff, that plaintiff failed to meet "her burden of proof in establishing causation and apportionment of damages." This appeal followed, with plaintiff asserting that she provided sufficient evidence that she sustained permanent injuries caused by the subject accident and that the motion judge failed to view all evidence and inferences therefrom in the light most favorable to her, as the non-moving party.

## II.

We review a grant of summary judgment using the same standard that governs the motion judge's decision. <u>RSI Bank v. Providence Mut. Fire Ins. Co.</u>, 234 N.J. 459, 472 (2018) (citing <u>Bhagat v. Bhagat,</u> 217 N.J. 22, 38 (2014)).

Under that standard, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995) (quoting R. 4:46-2). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Grande v. St. Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat, 217 N.J. at 38).

We must give the non-moving party "the benefit of the most favorable evidence and most favorable inferences drawn from that evidence." Est. of Narleski v. Gomes, 244 N.J. 199, 205 (2020) (quoting Gormley v. Wood-El, 218 N.J. 72, 86 (2014)); however, we owe no special deference to the motion judge's legal analysis. RSI Bank, 234 N.J. at 472 (citing Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016)).

The holder of every standard automobile liability insurance policy must select one of two tort options: the "[l]imitation on lawsuit option" or the "[n]o

limitation on lawsuit option." N.J.S.A. 39:6A-8. A person covered by an insurance policy with the limitation on the lawsuit option enjoys only "a limited right of recovery" for noneconomic damages sustained in automobile collisions. DiProspero v. Penn, 183 N.J. 477, 486 (2005). When plaintiffs are covered by the limitation on lawsuit option, they are bound to the so-called "verbal threshold" and may only recover in tort for non-economic damages if they "vault" the threshold. Davidson v. Slater, 189 N.J. 166, 181 (2007). To vault the verbal threshold, a plaintiff is generally confronted with two burdens.

First, in order to seek non-economic damages, plaintiffs with the verbal threshold must show that "as a result of bodily injury, arising out of [defendants'] . . . operation, . . . or use of . . . [their] automobile[s] . . . in this State . . . [they suffered] a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement."[4] N.J.S.A. 39:6A-8(a). A "permanent injury" is one that "has not healed to function normally and will not heal to function normally with further medical treatment." Ibid.

Second, in order to seek non-economic damages, plaintiffs with the verbal threshold must show that their injuries were proximately caused by defendants'

---

[4] Alternatively, plaintiffs may show they "sustained a bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures; [or] loss of a fetus . . . ." N.J.S.A. 39:6A-8(a).

negligence. Davidson, 189 N.J. at 185. "[T]he issue of a defendant's liability cannot be presented to the jury simply because there is some evidence of negligence. There must be evidence or reasonable inferences therefrom showing a proximate causal relation between defendant's negligence, if found by the jury, and the resulting injury." Ibid. (internal quotation marks and citations omitted).

Once a plaintiff proves permanent injury as to one body part, the verbal threshold imposes no impediment to recovery for non-economic damages caused by injuries to other body parts, regardless of whether those injuries are permanent. Johnson v. Scaccetti, 192 N.J. 256, 261-62 (2007) (stating "that once a plaintiff suffers a single bodily injury that satisfies a threshold category, the jury may consider all other injuries in determining noneconomic damages").

The Court in Davidson addressed the evidentiary burdens of a plaintiff who had a history of prior injuries, but did not plead aggravation in seeking damages for injuries allegedly caused by a single recent automobile collision. Davidson, 189 N.J. at 169. The trial court had dismissed plaintiff's complaint on summary judgment, holding that the plaintiff was required to distinguish between the prior injuries and those caused by the new accident. Ibid. The Court held that the trial court erred, concluding that the plaintiff could "carry her burden of moving forward in her non-aggravation case by demonstrating the

14

existence of a 'permanent' injury resulting from the automobile accident without having to exclude all prior injuries to the same body part." Id. at 170. The Court explained:

> When a plaintiff alleges aggravation of pre[-]existing injuries as the animating theory for the claim, then plaintiff must produce comparative evidence to move forward with the causation element of that tort action. When a plaintiff does not plead aggravation of pre-existing injuries, a comparative analysis is not required to make that demonstration. AICRA does not impose on plaintiff any special requirement for a comparative-medical analysis in respect of causation in order to vault the verbal threshold.
>
> [Ibid.]

The Court grounded its holding in "basic tort principles of causation and burden allocation as between plaintiffs and defendants." Ibid. The need for a comparative analysis depends "on traditional principles of causation and burden allocation applicable to tort cases generally." Id. at 184.

The Court recognized that a plaintiff who does not provide a comparative analysis may be caught flat-footed, if a defendant on summary judgment offers evidence "that no reasonable fact-finder could conclude that the defendant's negligence caused plaintiff's alleged permanent injury." Id. at 187-88.

Unlike in Davidson, where a defense expert questioned the causative effect of the plaintiff's recent accident, the motion record here includes no expert

A-3434-19

reports from any defense experts opining that plaintiff's current injuries were caused by her other accidents. See id. at 187 (citing with approval McCray v. Chrucky, 66 N.J. Super. 124, 128-29 (App. Div. 1961) for the proposition that a "defendant must persuade [the] jury that damages were due to [a] preexisting condition").

With respect to plaintiff's back injuries, Dr. Arginteanu's observation of an exacerbation is not the functional equivalent of pleading aggravation. Dr. Arginteanu noted plaintiff's onset of significant symptoms following the subject accident, including cervical and lumbar pain radiating down all four extremities, numbness, weakness, hand dysfunction, and gait difficulty. After reviewing imaging studies one month later, which revealed herniations caused or made worse by the subject accident, plaintiff underwent major surgery to her cervical spine on August 10, 2017, and major surgery to her lumbar spine on August 24, 2017. Plaintiff seeks compensation for the injuries caused by the trauma she sustained in the subject accident.

In sum, plaintiff was not obliged to provide a comparative analysis of her past, present, and subsequent injuries for purposes of satisfying AICRA. See Davidson, 189 N.J. at 186. Nor, applying basic principles of tort law and burden allocation, was plaintiff required as part of her prima facie case, to provide such

A-3434-19

a comparative analysis, because plaintiff did not plead aggravation of a pre-existing injury.  Id. at 187; see also Johnson, 192 N.J. at 284.

We consider next whether plaintiff was required to differentiate between the relative causative effects of the two collisions. "Although rare, a case may arise where damages cannot be apportioned between two or more accidents." Campione v. Soden, 150 N.J. 163, 175 (1997).  In such a case, we have held that the innocent plaintiff should not be barred from recovery.  Id. at 184-85.

Before adoption of the Comparative Negligence Act (the Act), N.J.S.A. 2A:15-5.1 to -5.3, we addressed a case involving the claims of plaintiffs who were occupants of a vehicle that was struck in a head-on collision, and then a few minutes later, struck by a second vehicle.  Hill v. Macomber, 103 N.J. Super. 127, 131-32 (App. Div. 1968).  Those plaintiffs offered no proofs that would have enabled the jury to allocate their damages among the tortfeasors.  We held that the tortfeasors would be jointly and severally liable.  We relied on "[t]he majority view in our country . . . [that] where there are collisions in rapid succession producing a single end result, and no proof as to what damage was separately caused by each collision, . . . both tortfeasors [shall be] jointly and severally responsible."  Id. at 136.  We explained that "it is better that a plaintiff, injured through no fault of his own, should be compensated by both tortfeasors,

17
A-3434-19

even though one of them may pay more than his theoretical share of the damage which his wrong has helped to create, than that the injured party have no recovery." Id. at 137.

However, the Act severely limited joint and several liability, and the viability of the result in Hill, which imposed joint and several liability. Campione, 150 N.J. at 175. The Court inferred that "the legislative objective would be achieved by requiring juries to apportion damages between the successive accidents and to apportion fault among the parties responsible for each accident." Id. at 184. However, if the trial court determines that apportionment by the jury is simply not possible, the Court held, the Act would not bar recovery by a plaintiff; instead, the trial court would be required to apportion damages equally among multiple tortfeasors.

> At the conclusion of a trial where allocation of damages among multiple tortfeasors is an issue, the trial court is to determine, as a matter of law, whether the jury is capable of apportioning damages. The absence of conclusive evidence concerning allocation of damages will not preclude apportionment by the jury, but will necessarily result in a less precise allocation than that afforded by a clearer record. If the court establishes as a matter of law that a jury would be incapable of apportioning damages, the court is to apportion damages equally among the various causative events. If the court concludes that the jury would be capable of apportioning damages, the jury should be instructed to do so.

[Ibid. (citations omitted).]

While the joint-and-several liability approach to the successive accident case is no longer viable, the Act as interpreted by Campione does not impose on a plaintiff the burden of proving apportionment in a successive accident case. Campione, 150 N.J. at 184-85. Hill held that the absence of such proofs by the plaintiffs in that case was not essential to their right to recover. Hill, 103 N.J. Super. at 135. Likewise, the absence of such proofs after the Act, as construed by the Court in Campione, is not necessarily fatal to a plaintiff's claim; rather, the defendants may present evidence to enable the jury to allocate damages among multiple accidents. Campione, 150 N.J. at 184.

This allocation of burdens is consistent with the Restatement (Second) of Torts § 433B(2) (Am. Law Inst. 1965):

> Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof is upon each such actor.

If there is a failure of proof by defendants, liability remains upon them. Id., § 433B, comment d. The rule is based on the same rationale enunciated in Hill: "As between the proved tortfeasor who has clearly caused some harm, and

the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." Ibid.

Notwithstanding the Court's clarification in Davidson, defendants maintain that plaintiff was required to present proof as to which collision caused plaintiff's injuries. They also argue that – notwithstanding the fact that plaintiff's complaint contained no allegations of aggravation of past injuries – the motion judge correctly held that plaintiff was required to differentiate between the injuries she sustained in the subject accident and the injuries she sustained in her other accidents. We disagree and conclude that 1) since plaintiff did not plead aggravation, she was not required to offer a medical analysis comparing her past injuries or later injuries, and her current injuries; and 2) defendants, as opposed to plaintiff, should have been assigned the burden to differentiate the causative effect of the respective collisions.

A "defendant, in response to an allegation that his negligence has caused injury, possesses the right of demonstrating by competent evidence that that injury 'could' have been caused, wholly or partly, by an earlier accident or by a pre-existing condition." Davidson, 189 N.J. at 187. Still, if a plaintiff not alleging aggravation of pre-existing injuries overcomes these risks and "produces evidence on all basic elements of her [or his] pled tort action" despite

not producing a comparative analysis, "her [or his] case may proceed to trial, except when the defendant can show that there is no genuine factual issue as to an element of the plaintiff's tort claim." Ibid.

Plaintiff argues she presented sufficient "evidence of injuries to two separate and distinct parts of the body — the spinal column, and the shoulder to survive defendants' summary judgment motion." While plaintiff admits she had pre-existing spinal injuries, she asserts that Dr. Arginteanu sufficiently distinguished the aggravation from the pre-existing spinal injuries. Specifically, plaintiff emphasizes that Dr. Arginteanu

> stated his medical opinion with a reasonable degree of medical probability that the new injuries which the plaintiff suffered in this accident were the animating reason for the plaintiff to have undergone two new fusion surgeries of the spine, one in the lumbar region which expands the prior surgery, and an entirely new cervical fusion surgery.

Plaintiff further contends she alleged that the subject accident caused her to suffer a new permanent injury to her shoulder. She argues Dr. Wert "causally related [her] shoulder injury to this accident and performed a comparative analysis between this accident and [the] subsequent accident . . . ." These proofs were sufficient to overcome summary judgment because "[a] jury could reasonably determine that . . . plaintiff suffered an injury caused related to [the

subject] accident . . . ." We agree with plaintiff that her experts provided sufficient causation opinions to survive summary judgment.

We further consider whether plaintiff was required to differentiate between the relative causative effects of the two collisions. "Although rare, a case may arise where damages cannot be apportioned between two or more accidents." Campione, 150 N.J. at 175. In such a case, we have held that the innocent plaintiff should not be barred from recovery. Id. at 184-85.

> At the conclusion of a trial where allocation of damages among multiple tortfeasors is an issue, the trial court is to determine, as a matter of law, whether the jury is capable of apportioning damages. The absence of conclusive evidence concerning allocation of damages will not preclude apportionment by the jury, but will necessarily result in a less precise allocation than that afforded by a clearer record. If the court establishes as a matter of law that a jury would be incapable of apportioning damages, the court is to apportion damages equally among the various causative events. If the court concludes that the jury would be capable of apportioning damages, the jury should be instructed to do so.
>
> [Ibid. (citations omitted).]

This allocation of burdens is consistent with the Restatement (Second) of Torts § 433B(2) (1965):

> Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof is upon each such actor.

If there is a failure of proof by defendants, liability remains upon them. Id., § 433B, comment d. The rule is based on the same rationale enunciated in Hill: "As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." Ibid. We conclude that plaintiff was not obliged to present proof apportioning the damage between the subject accident and her other accidents, as an essential element of his claim.

Our decision in Reichert v. Vegholm, 366 N.J. Super. 209 (App. Div. 2004), cited by defendants, does not compel a different result. In that case, the plaintiff sustained injuries to her neck, arms, and knee after a fall. Id. at 212. Almost a month later, the plaintiff suffered injuries to the same body areas in an automobile collision. Ibid. Plaintiff's medical expert was unable to apportion the plaintiff's damages. Id. at 212. The jury returned a no cause verdict on the plaintiff's claim against the tortfeasor in the automobile incident, finding that the plaintiff "did not sustain either an injury or an aggravation of any injury as a proximate cause of the automobile accident." Ibid.

On appeal, the plaintiff argued that defendants should have borne the burden of apportioning damages. Ibid. We reviewed our case law in which the apportionment burden, generally imposed on a tort plaintiff, had been allocated to defendants. Id. at 214-15. We noted that these exceptional cases usually involved both an innocent plaintiff, and defendants better suited than the plaintiff to marshal evidence regarding apportionment. Id. at 216.

However, we do not view both elements as an ironclad prerequisite to relieving a plaintiff of the burden of apportioning damages. See O'Brien (Newark) Cogeneration, Inc. v. Automatic Sprinkler Corp. of Am., 361 N.J. Super. 264, 275 (App. Div. 2003) (stating that the burden is "[o]ften . . . shifted to defendants with more expertise or better access to relevant apportionment proofs"). The Campione formulation allows equal allocation among defendants in order to secure a recovery for innocent plaintiffs where neither side has access to apportionment proofs. Campione, 150 N.J. at 184-85.

Between an entirely innocent plaintiff and a culpable defendant, fairness requires that the apportionment burden be placed on the culpable defendant. This is so because, without transferring the burden, plaintiff's failure of proof may result in dismissal of the case. O'Brien, 361 N.J. Super. at 275. Dismissal

24

for failure to precisely allocate damages is unfair when an entirely innocent plaintiff has clearly suffered some injury at the hands of a negligent defendant.

After reviewing the verbal threshold statute, we see no requirement that the comparing expert assign percentages of the injury caused by each accident. See, e.g., Johnson v. Scaccetti, 192 N.J. 256, 262-66, 284 (2007); Bennet v. Lugo, 368 N.J. Super. 466, 473-76 (App. Div. 2004) (finding a comparative analysis sufficient even though the physician did not offer percentages of causation from multiple injuries, but rather offered a detailed evaluation and treatment to establish causation, producing an "objective medical basis to substantiate" plaintiff's claims).

We also disagree with the motion judge's determination to reject the opinions of Dr. Arginteanu and Dr. Wert as net opinions. Both doctors examined plaintiff, had her undergo testing to assist them in diagnosing her injuries, and then provided treatment in the form of surgical procedures. Their reports adequately describe the injuries they diagnosed, their causal connection to the subject accident, and the resulting treatment they provided.

"An opinion that lacks . . . foundation and consists of bare conclusions unsupported by factual evidence is inadmissible as a net opinion." Anderson v. A.J. Friedman Supply Co., Inc., 416 N.J. Super. 46, 74 (App. Div. 2010).

25

"Simply put, the net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'" State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). Both Dr. Arginteanu and Dr. Wert isolated specific injuries or degrees of injury caused by the subject accident. We are satisfied their reports did not constitute net opinions.

While Dr. Arginteanu's reports for the 2011 accident and the subject accident indicate that plaintiff suffered herniations of the cervical discs at the C4-C5 and C5-C6 after both accidents, his March 25, 2019 report establishes causation between the subject accident and further injury. Plaintiff underwent an anterior cervical discectomy surgery on these discs following the subject accident. This surgery involved the removal of the discs at these levels and "replacement of these discs with cages and bone graft and internal fixation of the spine with titanium plate and screws . . . ." Since plaintiff did not require surgery during the six years between the 2011 accident and the subject accident, causation between the subject accident and injuries requiring surgery – six months after the subject accident – can be reasonably inferred. In addition, we note that this surgery occurred in August 2017, four months before the later accident.

Moreover, Dr. Arginteanu stated in his "Neurosurgical Follow-Up" report dated March 28, 2018, after the later accident, that there were "no complications of internal fixation devices" and "[i]t looks fine through the areas of surgery." Thus, Dr. Arginteanu established plaintiff's injuries to the C4-C5 and C5-C6 discs resulted from the subject accident.

Similarly, while both Dr. Arginteanu's reports for the 2011 accident and the subject accident showed plaintiff suffered bulging and stenosis of multiple lumbar discs, the subject accident caused plaintiff to undergo surgery involving "lumbar decompression, fusion, and instrumentation with removal of the disc between L3 and L4, removal of laminar bone between L3 and L4, replacement of the disc with a cage and bone graft and placement of titanium screws and rods in the lumbar spine." Thus, his reports support causation between the subject accident and injury to the L3-L4 level requiring surgery.

Dr. Wert also distinguished between the shoulder injuries plaintiff suffered in the subject accident and the later accident. Dr. Wert made clear that plaintiff first suffered the shoulder injury from the subject accident, specifically "a partial tear of the supraspinatus with tendinosis and a SLAP tear." Before the later accident, Dr. Wert had recommended surgery on the shoulder. Following

27

the later accident, Dr. Wert noted plaintiff suffered "an aggravation" and "re-injury" to her right shoulder.

Based upon our review of the record, viewed in the light most favorable to plaintiff as the non-moving party, a reasonable factfinder could find that defendants' conduct caused additional injury to plaintiff's spine, with resulting surgery and disability, as well as plaintiff's shoulder tear injury, with resulting surgery and disability. Whether causation exists is a question for the factfinder.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION